Phyllis RACKIN

v.

The UNIVERSITY OF PENN-
SYLVANIA et al.

Civ. A. No. 73–1007.

United States District Court,
E. D. Pennsylvania.

Dec. 18, 1974.

Peter Hearn, Philadelphia, Pa., for plaintiff.

Raymond K. Denworth, Jr., Philadelphia, Pa., for defendants.

## MEMORANDUM OPINION AND ORDER

WEINER, District Judge.

Dr. Phyllis Rackin, the plaintiff in this civil rights suit has charged that the defendants, the University of Pennsylvania (hereinafter "University"), its various officers and certain tenured members of the University's English Department have discriminated against her in the terms and conditions of her employment solely on the basis of her sex. The history giving rise to the instant litigation is set forth in the plaintiff's complaint.[1]

Essentially the complaint alleges that in 1962 Dr. Rackin, who had earned a Ph.D. in English, was appointed a fully-affiliated Instructor in the English Department of the University. She was promoted in June 1964 to a fully-affiliated Assistant Professor of English for a three year term. Subsequently, Dr. Rackin, believing her credentials sufficient, applied for promotion and tenure within the English Department. Under circumstances which deviated from normal procedure within the University her application was denied despite two votes of approval by the tenured members of the English Department. Instead, contrary to the University's policy that every tenured faculty member is to enjoy tenure in the department in which it is earned, she was granted tenure in the College of Arts and Sciences and, over her strenuous objections was assigned to teach freshman undergraduate courses. She further claims that she has not been permitted to teach courses in the area of her scholarly specialization even though she was successful in teaching these

1. Since we are considering defendants' motion to dismiss, all well pleaded material allegations of the plaintiff's complaint must be taken as true for the purpose of disposing of the defendants' motion. *See,* Walker Process Equip. Inc. v. Food Mach. & Chem. Corp., 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965).

courses for the past eight years as an untenured member of the English Department. Dr. Rackin states that she has been ousted from the English Department and has lost the privileges and prerequisites she enjoyed since 1962.

The plaintiff asserts that this treatment was and is discriminatory based solely on the fact that she is a woman. She contends that her qualifications to become a tenured member of the English Department are unrelated to her denial of tenure as demonstrated by the fact that she has twice been approved for promotion and tenure by the persons most knowledgeable in her field of specialization, the tenured members of the English Department. Dr. Rackin has filed the instant action alleging that by their foregoing conduct the defendants have violated 42 U.S.C. §§ 1981, 1983, 1985(3), 1986 and Executive Order 11246, 30 F.R. 12319 (September 28, 1965) as amended by Executive Order 11375, 32 F.R. 14303 (October 17, 1967) and the Pennsylvania Equal Pay Act, 43 P.S. § 336.1 et seq.

In response the defendants filed a motion to dismiss the plaintiff's complaint. Fed.R.Civ.P. 12(b). Applying the standards enunciated in Braden v. University of Pittsburgh, 477 F.2d 1 (3d Cir. 1973) we directed that discovery be completed on all issues raised by the defendants' dismissal motion. This order has been complied with and a most comprehensive record has evolved making the defendants' motion ripe for decision. We shall consider each of the defendants' contentions seriatim.

### I. *42 U.S.C. § 1983*

42 U.S.C. § 1983 provides as follows:

> "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the ju-

risdiction thereof to the deprivation of any rights, privileges, or immunities, secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

The defendants contend that suit can not be maintained against them since they are a private institution which has not acted under color of state law.[2] Although the issue raised appears well-defined on its face, many courts have acknowledged that:

> "Whether particular discriminatory conduct is private, on the one hand, or amounts to 'state action,' on the other hand, frequently admits of no easy answer. 'Only by sifting facts and weighing circumstances can the non-obvious involvement of the State in private conduct be attributed its true significance.' Burton v. Wilmington Parking Authority, [365 U.S. 715], 722, [81 S.Ct. 856, 6 L.Ed.2d 45] (1961)."

Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972).

The most recent decision on this "state action" issue emanates from the United States Court of Appeals for the Second Circuit in Jackson v. Statler Foundation, 496 F.2d 623 (2d Cir. 1974). In this case concerning the specific issue of whether several tax-exempt charitable foundations acted under color of state law the Court attempted to clarify the "state action" issue by setting forth some guidelines. They stated:

> "A review of the 'state action' case law suggests five factors which are particularly important to a determination of 'state action': (1) the degree to which the 'private' organization is dependent on governmental aid; (2) the extent and intrusiveness of the governmental regulatory scheme; (3) whether the scheme connotes govern-

2. Although defendants filed their motions as a motion to dismiss based on the pleadings we elected to permit the plaintiff to conclude discovery on the color of state law issue and in effect, treat defendants' motion as one for summary judgment. Fed.R.Civ.P. 12(b)(6).

ment approval of the activity or whether the assistance is merely provided to all without such connotation; (4) the extent to which the organization serves a public function or acts as a surrogate for the State; (5) whether the organization has legitimate claims to recognition as a 'private' organization in associational or other constitutional terms.

Each of these factors is material; no one factor is conclusive."

With this background in mind we shall now consider the following facts uncovered by the plaintiff's extensive discovery.

## 1. BACKGROUND OF UNIVERSITY AND COMMONWEALTH RELATIONS.

The roots of the University spring from the union of two schools; the College, Academy and Charitable School of Philadelphia, founded in 1740 and the University of the State of Pennsylvania, created in 1779 by a legislative act which appointed thirteen public officials to the twenty-five member Board of Trustees. The union of these two institutions was precipitated by the Pennsylvania General Assembly's Act of September 30, 1791 which also provided for the University's incorporation, charter, the requirement that the Trustees of the University annually submit a financial statement to the Legislature of the Commonwealth, and the appointment of the Governor of the Commonwealth as President of the Trustees. To date the Governor remains the titular head of the Trustees of the University.

## 2. COMMONWEALTH APPROPRIATION TO THE UNIVERSITY.

According to the plaintiff the Commonwealth's financial support of the defendant antedates that of any other college or university in Pennsylvania. At the present time in terms of state support the University would be categorized in the third tier of institutions of higher learning receiving appropriations from the Commonwealth. In descending order regarding the proportion of state money received these include: (1) "State-owned" institutions which are the thirteen State Colleges and the Indiana University of Pennsylvania; (2) the "State-related" institutions of which there are four; and (3) the "State-aided" institutions of which there are thirteen including the defendant University of Pennsylvania.[3] There are over 100 other institutions in Pennsylvania which do not receive any appropriations from the Commonwealth.

Since 1903 the General Assembly has regularly appropriated monies to the University for its general maintenance, providing such funds are shown to be necessary. This condition along with 72 P.S. § 3481[4] has resulted in the University submitting quarterly statements to the State Auditor General. These statements and University accounts are audited by the Commonwealth.

As one might expect in these times of increasing government involvement the annual appropriation to the University has more than doubled over the past twelve years so that in 1973 it reached $14,368,000.00. In terms of proportion this represents approximately seven to eleven per cent (7–11%) of the Univer-

3. This categorization clearly delineates the issue before the Court since the University of Pittsburgh, a "State-related" school may be held to act under color of state law, Braden v. University of Pittsburgh, 477 F.2d 1 (3d Cir. 1973), while Gettysburg College, a non-recipient of state appropriations has been determined not to act under color of state law. Brownley v. Gettysburg College, 338 F.Supp. 725 (M.D.Pa.1972). The issue of whether a "State-aided" school, which falls in the middle ground between "State-related" and non-recipient institutions, acts under color of state law is one of first impression.

4. This statute sets forth the prerequisite that before the Trustees receive the appropriated funds they must submit records to the State Auditor General for inspection.

sity's current operating income and approximately twenty-five per cent (25%) of the University's "hard-core" budget. The University has recognized that the "strategic importance" of the Commonwealth's participation is better exemplified by its contribution to the "hard-core" budget, which, according to the University, is the critical portion of the budget, upon which the quality of basic educational enterprise depends.[5] The funds which the Commonwealth appropriates to the University are unrestricted and appear to be utilized throughout the University. This state money along with tuition fees are the primary factors in balancing the University's precariously balanced budget and are the University's principal source of incremental income.

The possibility of the discontinuance of State aid to the University is an ominous thought which University officials constantly find confronting them. A memorandum which was prepared in 1967 for the benefit of the Trustees of the University contemplated this potential problem. It concluded that:

"An end to State assistance, even if phased over a period of years, would unquestionably demand an immediate and drastic curtailment of the University's activities. The extent of the contraction would be traumatic to the University." [6]

Considering the significance of the Commonwealth's contribution to the University it is not unexpected that the State Legislature, the body who determines the final amount of the University's annual dole, wields considerable influence over the University. The University, in its negotiations with the Commonwealth for each year's appropriation, constantly is attempting to appease its benefactor's wishes so that state monies continue to flow to the University. Each annual appropriation is granted on an ad hoc basis to the "State-aided" institutions in Pennsylvania and the State Legislature is not bound to renew them. Being acutely sensitive to this situation, the University is constantly lobbying in its own behalf. As a result it continually emphasizes its contributions to the Commonwealth and on several occasions has yielded to pressure from the Commonwealth and reluctantly made commitments to give preference to residents of the Commonwealth. These include: discounting tuition for Pennsylvania residents; enrolling a minimum of seventy per cent (70%) Pennsylvanians into the School of Veterinary Medicine; enrolling a minimum of fifty per cent (50%) Pennsylvanians into the School of Medicine and the School of Dental Medicine; and increasing the value of Senatorial Scholarships which are granted solely at the discretion of State Senators.

In addition to the University's active solicitation of aid from the Commonwealth at the University's urging an alumni committee has been formed throughout the Commonwealth to influence various State Legislators and members of the executive branch. The University and the committee members are

5. The "hard-core" or unrestricted budget is a method of presenting those activities whose net financial result directly affects the University's operating deficit. Its funds can be utilized for any purpose and any deficit incurred is to be covered by the University Operating Fund. This "hard-core" budget is essentially the University's educational and house-keeping budget. From it comes two-thirds of all expenditures for instruction and departmental research; half the student aid funds; and nearly all expenditures for library operating expenses and operation and maintenance of the University's physical plant. The solvency of the University depends upon balancing this budget and the growth of the revenues comprising this budget determine, "in large measure, the extent to which the University may advance towards its established goals." *See,* State Aid to the University of Pennsylvania: A Summary of its Importance to the University and the Commonwealth (Plaintiff's Appendix of Exhibits–19).

6. Memorandum: Evolution of Commonwealth—University Relationships, Minutes of Stated Meeting of the Corporation, October 13, 1967. (Plaintiff's Appendix of Exhibits–10).

keenly desirous of maintaining the University's status as "the only major independent institution of its kind in the country to receive an essential fraction of its income from a state[7]."

### 3. STATE CONSTRUCTION. LEASING AND FINANCING OF BUILDINGS FOR THE UNIVERSITY.

The Commonwealth of Pennsylvania has been an essential ingredient in maintaining, improving and expanding the physical plant of the University. The General State Authority (hereinafter "GSA"), legislated into existence in 1949 and authorized to assist "State-aided" institutions in 1955, has been the Commonwealth's primary instrumentality in financing large scale capital improvement projects for public buildings. Prior to 1963 in order for the GSA to construct a University facility, which would be financed by tax-exempt bonds issued by the GSA, the Trustees of the University were first required to convey fee simple absolute title to the tract of land and building to the GSA for $1.00. The GSA would then lease the property to the Pennsylvania Department of Public Instruction (now the Department of Education and hereinafter "Department") at an annual rent sufficient to amortize the bonds. The funds required to pay this rental were derived from the Department's annual appropriation. Finally, the Department with the approval of the Governor of the Commonwealth would sublease the facility to the "State-aided" institution for $1.00 per year.

Ten buildings serving the University were constructed, financed and leased in this manner.[8] Of the total cost of $50,694,409.00 for construction of these buildings, the GSA paid $33,839,521.00. The terms of each of the subleases provide that the subject building is to be subleased exclusively for the purpose specified. The University has the sole responsibility of maintaining and repairing the leased property, while the Department is required to provide all fire and casualty insurance and in the event of any loss the GSA is to rebuild the destroyed edifice. If the University wishes to alter or add to any leased premises, it must first secure written permission from the Department. Any default in the terms of the lease by the University will result in the lesser re-entering and taking possession.

The subleases of two of these facilities, the Van Pelt Library and the Graduate School of Fine Arts, further provide that the University surrender possession of each building after the termination of their 30 year subleases. The remaining eight subleases grant the University an option to purchase the leased premises. None of these options are exercisable until the 1990s.

In 1963, legislation was enacted which prospectively altered the foregoing arrangement between the Commonwealth and "State-aided" institutions. Much to the University's dissatisfaction, instead of their paying a nominal $1.00 annual rent on future GSA financed projects as is the case with pre 1963 GSA financed projects, they would henceforth be compelled to pay rent over the life of the lease sufficient to amortize the bonds the GSA would float to finance these new projects. Four buildings have been

---

7. Memorandum, Evolution of Commonwealth-University Relationships, Minutes of Stated Meeting of the Corporation, October 13, 1967, p. 151 (Plaintiff's Appendix of Exhibits–10).

8. These buildings include:
   (a) Undergraduate Library (Van Pelt Library)
   (b) Administration and General Services Building (Franklin Building)
   (c) Dietrich Graduate Library
   (d) Graduate School of Fine Arts
   (e) Gimbel Gymnasium
   (f) Medical Teaching and Research Building (Johnson Building)
   (g) Military Science and Physical Education (Hollenack Building)
   (h) Physical Sciences Addition (Rittenhouse Labs)
   (i) Social Science I
   (j) Veterinary Research Building

constructed, financed and leased to the University pursuant to this amended legislation.[9] The provisions of these subleases are substantially similar to the terms of the subleases of pre-1963 buildings except that upon termination of each sublease, then the leased premises shall be conveyed over to the University for $1.00.

In 1967 another state authority, the Pennsylvania Higher Educational Facilities Authority (hereinafter "PHEFA") was established. It has aided the University in numerous projects, the most noteworthy being the construction, financing and leasing of a $56,000,000.00 student residence complex. The arrangement between the University and PHEFA for the construction of this complex is very similar to the mechanics utilized in GSA financed projects. Prior to constructing this student residence complex the University was required to transfer its property rights within the project area to PHEFA. PHEFA then issued tax free bonds to finance the venture and the property was leased to the University for a rent sufficient to pay the principal and interest of the bonds. Upon termination of the lease in 2008, providing the University has complied with all the terms of the lease, the property shall be conveyed to the University.

The University, because of its relationship with the Commonwealth has been able to significantly improve and expand its physical plant since 1960. According to a University source, without the benefit of this State assistance it is highly doubtful that expansion would have occurred to such a great ex-tent. At the present time ten buildings on campus are being utilized on a virtual rent free basis and on five other buildings the University pays only the principal and tax due on the State issued tax-exempt bonds which were issued in order to finance the construction of these buildings. Furthermore, since PHEFA and GSA do issue tax-exempt bonds, they are able to raise funds at a lesser cost than the University could privately. Therefore, despite the 1963 legislation which somewhat retarded the University's expansion by terminating the rent free status of all future capital improvement projects, the University still enjoys a lower overall net cost in the financing of post 1963 projects and free rent on ten pre-1963 buildings.[10]

## 4. FEDERAL CONSTRUCTION GRANTS AND CONTRACTS.

The financial records of the University indicate that pursuant to the Health Facilities Research Act of 1956, 42 U.S. C. §§ 292–292j and Titles II and III of the Higher Education Facilities Act of 1963, 20 U.S.C. §§ 731–733, 741–746,[11] it has received over $16,000,000.00 in construction grants from the federal government. No Commonwealth relation to these funds has been demonstrated except for the fact that the University is required to match these monies with funds from non-federal sources which may be comprised of State and local donations.

On the other hand, the Commonwealth was of vital importance in the over $2,200,000.00 in grants and the federally guaranteed mortgage of $2,040,000.00 with a three per cent (3%) subsidy that

---

9. These buildings include:
   (a) Dental Teaching and Research (Levy Building)
   (b) Social Science II (McNeil Building)
   (c) Chemistry Building
   (d) Humanities Building (Williams Building)
   The total cost of these buildings is $25,741,533.36 of which the GSA paid $16,247,872.36.

10. We note that according to the University's Fire Insurance Valuation the GSA and PHEFA projects represent approximately 20 per cent (20%) of the total value of the University's properties. The plaintiff vigorously disputes this characterization since the total book value of the University's property differs significantly from the Fire Insurance Valuation.

11. The subject matter of this statute is now covered in 20 U.S.C. § 1132a et seq.

the University received under Title I of the Higher Education Facilities Act of 1963, 20 U.S.C. §§ 701–721[12] and the Hill-Burton Act of 1964, 42 U.S.C. § 291 et seq. Without the Commonwealth the University would never have reaped the benefits of these programs since the Commonwealth jointly administers the Hill-Burton Program along with the federal government and no institution in a State is eligible to receive federal funds under Title I of the Higher Education Facilities Act until a designated State Commission has approved and recommended the project for an institution.

### 5. PUBLIC FUNDING OF UNIVERSITY RESEARCH PROJECTS.

The federal government is by far the primary financier of the University's sponsored research projects.[13] Each federal research grant mandates University financial participation to a degree beyond mere token support. In order to comply with this condition, on occasion, · the University has requested the Commonwealth to provide a matching contribution toward costs of. federally sponsored research projects.

The Commonwealth has enjoyed a more involved role in the 19 "hybrid" research projects that the University has received since 1966. These "hybrid" research grants were authorized by federal statute and/or financed by federal funds, however, they were actually awarded to the University by the Commonwealth.

Although exclusively sponsored federal research grants overshadow exclusively sponsored Commonwealth research grants, the Commonwealth still has awarded over $4,000,000 in research contracts to the University since 1962. Interestingly enough, most of these contracts specifically prohibit the University from discriminating in employment on the basis of sex, race, color, religion or national origin.

### 6. TAX EXEMPTIONS AND BENEFITS.

The University because of its status as a non-profit educational institution enjoys various tax benefits from the local, state and federal governments. In 1973 the city and state tax exemptions amounted to a saving to the University which surpassed $5,000,000.00.

### 7. SCHOLARSHIP AND LOAN AID.

Pennsylvania residents who are undergraduates at various approved institutions of higher education throughout Pennsylvania, which includes the University, are eligible for Pennsylvania Higher Education Assistance Agency (hereinafter "PHEAA") scholarships and guarantees for bank loans. 24 P.S. § 5101 et seq. These students apply to PHEAA for a scholarship and if successful, PHEAA makes payment directly to the institution in the name of the student. To gain approval for receipt of PHEAA scholarships and loan guarantees, and in accordance with the law, 24 P.S. §§ 5104.1 and 5158.2, these institutions have agreed to report to PHEAA any grant recipients who are convicted of a felony in a court of record.

The University, in order to alleviate the depletion of its own financial aid resources, requires its students to first apply to PHEAA for aid. Since the inception of the PHEAA program in the mid-1960s, University students have received 4971 scholarships with a value of $4,418,767.00 and 6157 loan guarantees in the amount of $7,694,678.00. The scholarships and loan guarantees have increased progressively since the mid-1960s.

Desirous of contributing something back to Commonwealth students for the

---

12. *Id.*

13. For example, in fiscal year 1973 approximately $50,000,000.00 of the University's $57,239,645.00 in project research awards originated from federal sources.

Commonwealth's support of the University, the University also participates in the State Senatorial Scholarship Program whereby each State Senator and the Lieutenant Governor of the Commonwealth is, in effect, entitled to grant 24 one year scholarships or 6 four year scholarships to Pennsylvania residents accepted to the University. The University funds these scholarships which are worth $700.00/year to each student attending the University. Since 1966, the University has paid an annual average of approximately $600,000.00 in tuition fees for these students.

We note that the University is the only "State-aided" institution which accepts Senatorial Scholarships. The remaining four schools which particiapte in the program, Pennsylvania State University, University of Pittsburgh, Temple University and Lincoln University are all "State-related institutions. The value of one year Senatorial Scholarships awarded to students attending these Universities are $375.00, $486.00, $490.00 and $700.00 respectively. State Senators are entitled to award 24 one year scholarships or 6 four year scholarships to each of these "State-related" universities except for Lincoln University for which an unlimited number can be awarded.

Funds are also allocated by the University to support the City of Philadelphia's Mayoralty and School District Scholarship Programs. The University underwrites these programs which annually amount to 125 full scholarships to the University as partial consideration for certain real estate which the city conveyed to the University.

8. UNIVERSITY AGREEMENT WITH THE CITY OF PHILADELPHIA REDEVELOPMENT AUTHORITY.

Since the Planning Commission of the City of Philadelphia has declared portions of the area adjacent to the University through the instrumentality of the city's Redevelopment Authority, University through the instrumentality of the city's Redevelopment Authority, has been able to purchase property by the indirect exercise of the right of eminent domain. Under Pennsylvania law, 35 P.S. § 1701 et seq., the Redevelopment Authority is empowered to purchase and acquire land, to clear buildings thereon, to exercise the right of eminent domain, and to convey to others and to enter into agreements with others for the purpose of redevelopment of the land and buildings. The sites purchased by the University, via the Redevelopment Authority, include land for the Annenberg School of Communications, the Wharton School, the Levy Oral Health Center, and undergraduate and graduate student housing.

Mechanically, when the University desired to purchase land in this Redevelopment area, it would enter into an agreement with the Redevelopment Authority whereby the Redevelopment Authority would acquire the property through eminent domain or agreement and then convey the project area to the University for the purchase price paid by the Redevelopment Authority. These agreements with the Redevelopment Authority also usually provided that the University would utilize the acquired property for the purpose specified in its redevelopment proposal and that it would not discriminate in the use, sale or lease of this land on the basis of religion, race, color or national origin. The Authority agreed to permit the University to utilize the services of its staff and the fruits of their studies in the project area following the completion of the project. The Authority retained the right to inspect the property to insure its proper maintenance. In the event of flagrant neglect, the Authority could institute proceedings to reacquire the site.

9. SPECIFIC COMMONWEALTH CONCERN REGARDING DISCRIMINATION IN EDUCATION.

In addition to the Commonwealth's general proscription against arbitrary discrimination, which often appears in many of its contracts, the Common-

wealth has demonstrated its concern for any possible arbitrary discrimination by the University in two more instances.

Since 1966, the University has collected data for the Higher Educational General Information Survey (hereinafter "HEGIS") which makes an annual comprehensive survey of the operation of universities and colleges to be utilized by various state, federal and private agencies. Among the statistics collected from the University was a report entitled, "Employees in Institutions of Higher Education" which compares the mean salaries of male and female educators employed by the University. Perhaps because of the disclosure that females enjoy a lower mean salary within the University, more in depth information concerning the race, sex and salary levels of selected administrators and the race, sex and academic area of all faculty members has recently been requested by the Office of Equal Opportunity in the Commonwealth Department of Education and the Pennsylvania Human Relations Commission.

Another indication of Commonwealth interest in equal opportunity in education was voiced by the Pennsylvania Legislature in 1961 in the Pennsylvania Fair Educational Opportunities Act. 24 P.S. § 5001 et seq. Here the Legislature declared that it was the Commonwealth's policy that "all persons shall have equal opportunities for education regardless of their race, religion, color, ancestry or national origin." 24 P.S. § 5002(a).

In 1972 this Act was amended adding a prohibition against discrimination based upon sex. The Legislature further refined the Act so that the sex amendment would not apply to any educational institution which was neither State-owned, State-related or State-aided. The University was specifically declared to be under the auspices of this statute because of its State-aided status.

## DISCUSSION

■ Having recited the highlights of the voluminous discovery proceedings, we are now prepared to determine whether the defendants' alleged discriminatory conduct amounts to "state action" or is private conduct against which the Equal Protection Clause of the Fourteenth Amendment "erects no shield." *See*, Shelley v. Kraemer, 334 U.S. 1, 13, 68 S.Ct. 836, 92 L.Ed. 1161 (1948).

The defendants contend that even admitting the bevy of facts disclosed by the plaintiff's discovery, these facts are insufficient to establish "state action" by the University since she failed to prove that the Commonwealth was directly involved in the activity which was alleged to be discriminatory i. e., the tenure, promotion and personnel decisions of the College of Arts and Sciences. They assert that a panoply of federal courts [14] have found this nexus indispensable in establishing "state action" and that this theory was adopted by the Supreme Court of the United States in the case of Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1973).

In *Moose Lodge* the Supreme Court ruled that the operation of the regulatory scheme enforced by the Pennsylvania Liquor Control Board did not sufficiently implicate the Commonwealth in the racially discriminatory guest practices of a private club to make those practices "state action" prohibited by the Equal Protection Clause. During the course of its opinion the Court reaffirmed its earlier holdings which indicated that:

"[W]here the impetus for the discrimination is private, the State must have 'significantly involved itself with the invidious discriminations,' Reitman v. Mulkey, 387 U.S. 369, 380 [87 S.Ct. 1627, 1634, 18 L.Ed.2d 830] (1967), in order for the discrimina-

14. In particular the defendants rely upon the cases of: Jackson v. Metropolitan Edison Company, 483 F.2d 754 (3d Cir. 1973), cert. granted, 415 U.S. 912, 94 S.Ct. 1407, 39 L.Ed.2d 466 (1974); Powe v. Miles, 407 F.2d 73 (2d Cir. 1968).

---

tory action to fall within the ambit of the constitutional prohibition." Id. at 173, 92 S.Ct. at 1971.

Although the *Moose Lodge* Court did reaffirm the method of proving "state action" suggested by the defendants herein, it did not foreclose another means previously utilized to bring private discrimination within the proscriptions of the Fourteenth Amendment. In reaching its conclusion the Supreme Court distinguished the facts of *Moose Lodge* from the earlier case of Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). In *Moose Lodge, supra,* 407 U.S. at 172, 173, 92 S.Ct. 1965, the Court described *Burton* as a case in which:

"[A] private restaurant owner who refused service because of a customer's race violated the Fourteenth Amendment, where the restaurant was located in a building owned by a state-created parking authority and leased from the authority. The Court, after a comprehensive review of the relationship between the lessee and the parking authority concluded that the latter had 'so far insinuated itself into a position of interdependence with Eagle [the restaurant owner] that it must be recognized as a joint participant in the challenged activity, which, on that account, cannot be considered to have been so 'purely private' as to fall without the scope of the Fourteenth Amendment.' 365 U.S. at 725 [81 S.Ct. at 862]."

▪ The *Moose Lodge* Court clearly indicated that *Burton* stood for the proposition that the existence of a symbiotic relationship between the State and the private party charged with illegal discrimination may, without the showing of a direct nexus, make the State a joint participant in the illegal conduct sufficient to bring the discrimination within the prohibitions of the Fourteenth Amendment. No such relationship was alleged or could be proven in *Moose Lodge* and therefore the Court confined its inquiry to the distinct issue of whether the State, in any way, directly fostered or encouraged discrimination.[15] The Supreme Court did not overrule the means recognized in *Burton* to prove "state action" nor in any way suggest that a direct nexus must be exposed between the State and the private party in order to prove constitutionally impermissable discrimination.

Moreover, this position has been sustained by our own Third Circuit Court of Appeals in the case of Braden v. University of Pittsburgh, 477 F.2d 1, 4 (3d Cir. 1973), a post *Moose Lodge* decision. In *Braden,* an action in which a female professor also alleged that her employer University discriminated against her solely on the basis of her sex, the Court ruled that under the facts alleged the *Burton* test governed the issue of "state action" and it must be decided"

"(W)hether the Commonwealth, in the language of Mr. Justice Clark, [the author of the *Burton* decision] 'has so far insinuated itself into a position of interdependence' with the University that it must be recognized as a joint participant in the challenged activity, i. e., discriminating against women."

▪ The Court of Appeals in *Braden* did not limit its inquiry to the narrow issue of whether the Commonwealth was directly involved in the alleged discriminatory practice but, instead, considered the overall relationship of the party charged with discrimination and the State. We believe that the *Burton* methodology is applicable in the instant litigation also.

The defendants contend that *Burton* must be construed to require not only an interdependence between the State and private party charged with discrimina-

---

15. We note that the Supreme Court did state that a Liquor Control Board regulation which required every club licensee to adhere to all provisions of its Constitution and By-Laws was a sufficient nexus to create "state action" outlawed by the Fourteenth Amendment where the private club's constitution mandated a racially discriminatory membership policy. 407 U.S. at 178, 179, 92 S.Ct. 1965.

tion, but, also that the State is financially dependent upon the private party and is a direct beneficiary of the private party's profitable activities. *See*, Jackson v. Metropolitan Edison Company, 483 F.2d 754, 757 (3d Cir. 1973), cert. granted, 415 U.S. 912, 94 S.Ct. 1407, 39 L.Ed.2d 466 (1974).

■ Although in *Burton* such was the case, we believe this factor to be merely another incidental circumstance to be considered in the sifting and weighing process and not an indispensable ingredient without which "state action" can not be proven. There appears to be no logical reason to make a finding of "state action" dependent upon the State receiving financial benefits. The *Jackson* case, upon which the defendants rely for this financial benefit theory, was simply describing the facts of *Burton* and not suggesting that an identical factual setting is the only one which can give rise to a finding of "state action". As a matter of fact numerous courts have found "state action" by non-profit institutions. E. g., O'Neill v. Grayson County War Memorial Hospital, 472 F. 2d 1140 (6th Cir. 1973); Sams v. Ohio Valley Gen. Hosp. Association, 413 F.2d 826 (4th Cir. 1969); Citta v. Delaware Valley Hospital, 313 F.Supp. 301 (E.D. Pa.1970); Smith v. Young Men's Christian Assn. of Montgomery, 316 F.Supp. 899 (M.D.Ala.1970), aff'd as modified, 462 F.2d 634 (5th Cir. 1972); Commonwealth of Pa. v. Brown, 270 F.Supp. 782 (D.C.1967), aff'd, 392 F.2d 120 (3d Cir. 1968), cert. denied, 391 U.S. 921, 88 S.Ct. 1811, 20 L.Ed.2d 657 (1968).

■ Applying the *Burton* standard to the facts of the instant litigation we are of the opinion that although individually each of the factors composing the Commonwealth-University relationship may not be sufficient to establish "state-action",[16] when combined, they demonstrate that the Commonwealth, in the language of the *Braden* Court, " 'has so far insinuated itself into a position of interdependence' with the University that it must be recognized as a joint participant in the challenged activity . . ." 477 F.2d at 4.

This symbiosis becomes readily apparent when one considers the give and take relationship which has developed between the University and the Commonwealth principally because of the University's substantial financial dependence upon the Commonwealth. Each participant enjoys the mutual benefits derived from their relationship. The Commonwealth, by aiding the University, has enabled the residents of Pennsylvania to continue to take advantage of the multitude of opportunities available from a major university. Commonwealth funds, on the other hand, in the form of less expensive and rent free educational facilities for the University's primary learning centers, annual appropriations, tax exemptions, scholarships, and research projects are filtered throughout the entire University to all facets of the educational process. If the source were to run dry, the University's operations and status would suffer irreparably to the point where it could no longer compete as an educational institution of national prominence.

---

16. The defendants rely upon the cases cited below to demonstrate that the following factors, standing alone, are insufficient to establish "state action". This may be the case, however, we note that our opinion is premised upon the total picture these facts encompass which, as the University admits, makes it unique among institutions of higher education.

(a) Tax exemptions: Blackburn v. Fisk University, 443 F.2d 121 (6th Cir. 1971); Browns v. Mitchell, 409 F.2d 593 (10th Cir. 1969); Furumoto v. Lyman, 362 F.Supp. 1267 (N.D.Cal.1971); McLeod v. College of

Artesia, 312 F.Supp. 498 (D.N.Mex.1970).

(b) Scholarships and Loans: Brownley v. Gettysburg College, 338 F.Supp. 725 (M.D. Pa.1972); Torres v. Puerto Rico Junior College, 298 F.Supp. 458 (D.P.R.1969).

(c) Government Support of Research Projects: Wahba v. New York University, 492 F.2d 96 (2d Cir. 1974).

(d) Contacts with City: Grafton v. Brooklyn Law School, 478 F.2d 1137 (2d Cir. 1973).

(e) Construction, Leasing and Financing of Buildings: McLeod v. College of Artesia, *supra*.

The Commonwealth, in effect, maintains a stranglehold on the University and therefore potentially has significant input into University policies.

The University has not remained impervious to this reality as evidenced by its varying admission standards for Pennsylvania residents in the Schools of Dental Medicine, Veterinary Medicine, Medicine; acceptance of Senatorial Scholarships; and reducing tuition for Pennsylvania residents. In light of these concessions, which the University considers contrary to its sound academic and policies, we doubt that the University would ever make major policy decisions without looking over its shoulder to gauge the attitude of its omnipresent informal partner.

### II. 42 U.S.C. §§ 1985(3), 1986.

Defendants have also moved to dismiss that portion of the plaintiff's complaint premised upon violation of 42 U.S.C. §§ 1985(3), 1986. Section 1985(3) provides in pertinent part:

"If two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws . . . [and] if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy . . . the party so injured or deprived may have an action for the recovery of damages . . . ."

Section 1986 provides in pertinent part that: .

"Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 . . . are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses to do so . . . shall be liable to the party injured . . . ."

Relying upon the case of Dombrowski v. Dowling, 459 F.2d 190 (7th Cir. 1972) the defendants assert that plaintiff's action based upon these provisions must fall because there is no state action present to invest this Court with jurisdiction. In light of our finding state action, this argument has become moot.

The *Dombrowski* decision has also provided the defendants with a second ground to challenge our jurisdiction under these sections. In *Dombrowski*, a case where a corporate landlord refused to rent office space to a white attorney with a black clientele, the Court held that the conspiracy requirement of section 1985,

"[I]s not satisfied by proof that a discriminatory business decision reflects the collective judgment of two or more executives of the same firm. We do not suggest that an agent's action within the scope of his authority will always avoid a conspiracy finding. Agents of the Klan certainly could not carry out acts of violence with impunity simply because they were acting under orders from the Grand Dragon. But if the challenged conduct is essentially a single act of discrimination by a single business entity, the fact that two or more agents participated in the decision or in the act itself will normally not constitute the conspiracy contemplated by this statute. *Cf.* Morrison v. California, 291 U.S. 82, 92, 54 S.Ct. 281, 78 L.Ed. 664."

*Id.* at 196.

Defendants attempt to apply this reasoning to the instant case by asserting that they were merely the employees of one business entity, the University, and they made a single decision to deny the plaintiff tenure in the English Department.

We do not agree that the foregoing is a proper characterization of the plaintiff's complaint. She has alleged many continuing instances of discrimination and harassing treatment by the alleged conspirators. Her allegations comprise much more than "essentially a single act of discrimination by a single

business entity" and therefore the Dombrowski decision is inapplicable.

### III. *Civil Rights Act of 1964 as Amended*

■ The plaintiff in her complaint has alleged that the defendants have violated her rights under Title VII of the Civil Rights Act of 1964 as amended on March 24, 1972, 42 U.S.C. § 2000e et seq. This Act, as originally enacted did not apply to educational institutions. 42 U.S.C. § 2000e–1. In March 1972 this exemption was deleted and the law is well established that as of March 24, 1972, the effective date of this amendment, it is unlawful for an educational institution to discriminate against its employees on the basis of sex.

■ Defendants contend that the alleged acts of discrimination which are the gravamen of the plaintiff's complaint occurred prior to March 24, 1972 and therefore are not cognizable under the Civil Rights Act of 1964 as amended on March 24, 1972. Although said Civil Rights Act is prospective in nature that does not foreclose the issue.

■ It is true that Dr. Rackin was denied promotion and tenure in the English Department well before March 24, 1972. However, her employment at the University has continued and in her amended complaint she has alleged that her discriminatory treatment has continued and that she still experiences the effects of the University's earlier discriminatory conduct in regard to, *inter alia,* her pay, her being deprived of teaching courses in her area of scholarly specialization and the unprecedented requirements set by the University for her being readmitted and reconsidered for promotion and tenure in the English Department. The law is quite clear that relief may be granted under Title VII to remedy present and continuing effects of discrimination which occurred prior to the effective date of the Civil Rights Act of 1964. *E. g.,* Robinson v. Lorillard Corp., 444 F.2d 791, 795, n.2 (4th Cir. 1971), cert. dism. 404 U.S. 1006, 92

S.Ct. 573, 30 L.Ed.2d 655 (1972); United States v. Dillon Supply Co., 429 F.2d 800 (4th Cir. 1970); Griggs v. Duke Power Co., 420 F.2d 1225 (4th Cir. 1970), reversed on other grounds, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); United States v. Sheet Metal Workers International Assn. Local 36, 416 F.2d 123 (8th Cir. 1969); Local 53, International Association of Heat and Frost Insulators and Asbestos Workers v. Vogler, 407 F.2d 1047 (5th Cir. 1969); Quarles v. Phillip Morris, Inc., 279 F.Supp. 505 (E.D.Va.1968). A primary purpose of the Civil Rights Act of 1964 was to achieve equality in employment opportunity and remove barriers which existed in the past. Griggs v. Duke Power Co., *supra.*

The case of Johnson v. University of Pittsburgh, 359 F.Supp. 1002 (W.D.Pa. 1973) appears to be controlling as to whether the 1972 amendments should be read in the same light. In *Johnson,* the defendant University of Pittsburgh's Department of Biochemistry in the School of Medicine voted to deny tenure to and discharge Sharon Johnson, an Assistant Professor therein. She was notified in writing of this decision on March 8, 1972 at which time she also learned that her discharge would become effective June 30, 1973. She filed a claim alleging sex discrimination with the Equal Employment Opportunities Commission (hereinafter EEOC) on April 9, 1972 and eventually was authorized to bring suit. The University of Pittsburgh, in response to the motion for a preliminary injunction which she filed, asserted that the court lacked jurisdiction over her Title VII claim because the decision and notification of her being denied tenure and discharge occurred prior to the effective date of the 1972 amendments. In holding to the contrary, the Court's analysis was premised upon the fact that since Ms. Johnson would continue to be employed by the University of Pittsburgh subsequent to March 24, 1972 until the effective date of her discharge on June 30, 1973, the results of the University's past dis-

criminatory policies were being made effective following the effective date of the 1972 amendments.[17]

In the instant case the plaintiff's employment by the University has also continued and the effects of the defendants alleged past discrimination are allegedly still being presently experienced by Dr. Rackin. In accordance with *Johnson* we believe that the remedial 1972 Act should be construed liberally to permit the plaintiff to maintain her action in the instant case.[18]

### IV.  *29 U.S.C. § 206(d)*

■ Plaintiff has also alleged that defendants have violated the Equal Pay Act of 1963, 29 U.S.C. § 206(d) which provides in relevant part:

"(1) No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any

other factor other than sex:  *Provided*, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee."

Defendants assert that plaintiff's job is subject to the exceptions of 29 U.S.C. §§ 206(d)(1)(ii)(iii), since the pay of professors, assistant professors and associate professors is based upon merit and the quality of their work product.[19]

Plaintiff, on the other hand, insists that the University, solely on the basis of sex, systematically discriminates against female faculty members regarding their pay. We do not believe that the record is sufficiently ripe to permit us to determine this factual issue and therefore will deny what amounts to defendants' motion for summary judgment on plaintiff's claim under the Equal Pay Act of 1963. *See, e. g.*, United States ex rel. Jones v. Rundle, 453 F.2d 147, 150 (3d Cir. 1971).

### V.  *Executive Order 11246, 30 F.R. 12319, as Amended by Executive Order, 11375, 32 F.R. 14303.*

■ Briefly summarized the above mentioned Executive Orders require every institution which contracts with the federal government to take affirmative action to insure that their employees are treated during employment without regard to their race, color, religion, sex or national origin. The University is a federal ·contractor according to the

---

17. In reaching its decision the *Johnson* Court also noted:
"The Act is silent as to its effect on a situation such as this. In Section 14 of the 1972 amendments, there is a provision that Section 706 (42 U.S.C. § 2000e–5), the procedure section, applies to cases where the charges were pending on the effective date of the Act and to all charges filed thereafter. The Act, however, is silent with respect to Section 702 the removal of the educational exemption." 359 F.Supp. at 1007.

18. As in the *Johnson* case we are also familiar with the case of Hill-Vincent v. Richard-

son, 359 F.Supp. 308 (N.D.Ill.1973), which appears to reach a contrary result. However, as the *Johnson* Court noted, in *Hill-Vincent* the discriminatory discharge had apparently taken place prior to the effective date of the 1972 amendments and therefore was not controlling. 359 F.Supp. at 1007.

19. Defendants have filed the affidavit of William G. Owen, Secretary of the University to substantiate this claim. Mr. Owen's affidavit includes the conclusory comment that University salaries for faculty members of similar rank vary on the basis of merit and competence.

plaintiff's amended complaint and therefore must abide by these Executive Orders.

Defendants have moved to dismiss any claims the plaintiff is asserting arising from these Orders because the Orders contemplate no private right of action. A careful reading of these Orders reveal that enforcement is provided for solely by the Office of Federal Contract Compliance of the Department of Labor. The foregoing was clearly the holding of the District Court in the *Braden* case which, as we previously noted, was subsequently reversed on other grounds by our Third Circuit. Braden v. University of Pittsburgh, 343 F.Supp. 836, 840 (W.D.Pa.1970), rev'd on other grounds, 477 F.2d 1 (3d Cir. 1973).

In order to avoid the same result that the District Court reached in *Braden*, the plaintiff has propounded an ingenious argument. She reasons that since Executive Orders have the force of federal law, violation of these Orders would give her a claim under 42 U.S.C. § 1983 which creates a cause of action for any citizens deprived of any rights secured by the "Constitution and laws."

In essence, the plaintiff is arguing that she has a cause of action under Section 1983. We agree. However, this is not responsive to whether she has an independent, private cause of action pursuant to these Executive Orders. We therefore find ourselves in accord with the District Court in *Braden* which held that since these Executive Orders in no way contemplate a private cause of action, the plaintiff has failed to state a cause of action upon which relief could be granted.

### IV. *42 U.S.C. § 1981*

Defendants, asserting that 42 U.S.C. § 1981 pertains solely to discrimination based upon race or alienage have moved to dismiss plaintiff's sex discrimination claims premised thereon. 42 U.S.C. § 1981 reads in relevant part:

> "All persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of the laws and proceedings for the security of persons and property *as is enjoyed by white citizens* . . ." (emphasis added).

Plaintiff notes that Section 1981 was originally enacted in 1866 pursuant to the Thirteenth Amendment to the United States Constitution outlawing slavery.[20] Subsequent thereto, in 1870 after the ratification of the Fourteenth Amendment which has been held to prohibit, *inter alia*, sex discrimination, e. g., Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971), Section 1981 was re-enacted.[21] In this latter re-enactment Congress substituted the present words "[A]ll persons within the jurisdiction of the United States," for the language in the 1866 Act which referred to "all persons born in the United States and not subject to any foreign power." Plaintiff now contends that the foregoing course of events demonstrates that Section 1981 was amended to confer the rights "enjoyed by white citizens" on all persons, which naturally would include females. In effect, she subscribes to the theory that "white citizens" referred only to white male citizens, since they were the only ones with significant rights in 1870. Plaintiff, however, has been unable to cite any cases supporting this view.

To the contrary, defendants have cited several cases for the proposition that discrimination based solely on sex is inactionable under 42 U.S.C. § 1981. League of Academic Women v. Regents of the University of California, 343 F. Supp. 636 (N.D.Cal.1972); Williams v.

---

20. Act of April 9, 1866, c. 31, § 1, 14 Stat. 27. The United States Supreme Court has clearly ruled that the 1866 Act only prohibited racial discrimination. State of Georgia

v. Rachel, 384 U.S. 780, 791, 86 S.Ct. 1783, 16 L.Ed.2d 925 (1966).

21. Act of May 31, 1870, c. 114, § 16, 16 Stat. 144.

San Francisco Unified School District, 340 F.Supp. 438 (N.D.Cal.1972); Fitzgerald v. United Methodist Community Center, 335 F.Supp. 965 (D.Neb.1972).

■■■ We agree with the holdings of these cases and find ourselves most persuaded by the language of Judge Renfrew in League of Academic Women v. Regents of the University of California, *supra*, 343 F.2d at 638, 639:

"Section 1981 was enacted to protect the rights of two groups of people—non-whites and non-citizens who were not afforded equal treatment to white citizens. The standard against which the rights of these people must be measured is the rights of *white citizens*. The change in language to include 'all people' was designed to include non-citizens and persons not born in the United States within the coverage of the Act. The amendment was not so broad as to extend coverage to all rights of all people. The 'all persons' language of the statute speaks only to the issue of to which persons the Act applies. It does not purport to delineate the rights accorded those individuals. The standard against which the rights of the protected individuals must be matched remains the rights of white citizens.

. . . [T]here is nothing in the history of the Act to suggest that Congress envisioned any sexual differences when it established the white citizen standard."

In light of the foregoing we hold that plaintiff may not maintain an action for sex discrimination under 42 U.S.C. § 1981.

VII. *Pennsylvania Equal Pay Law, 43 P.S. § 336.2 et seq.*

Premised upon their expectation that all federal claims would be dismissed, the defendants also moved to dismiss this state based cause of action for lack of federal pendent jurisdiction. In light of our maintaining jurisdiction over plaintiff's federal claims under 42 U.S. C. §§ 1983, 1985(3), 1986, 2000e et seq. and 29 U.S.C. § 206(d), defendants' motion is no longer viable.