Dr. Sidney SAMENT

v.

The HAHNEMANN MEDICAL
COLLEGE AND HOSPITAL
OF PHILADELPHIA et al.

Civ. A. No. 73–1396.

United States District Court,
E. D. Pennsylvania.

Feb. 10, 1976.

Michael H. Goldman, Philadelphia, Pa., for plaintiff.

Andrew S. Price, Philadelphia, Pa., for defendants.

OPINION

DITTER, District Judge.

The questions presented by the instant motion for summary judgment are whether the non-reappointment of a physician to the staff of a private, nonprofit medical college and hospital constituted state action for purposes of triggering Fourteenth Amendment guarantees, and if so, whether the procedure by which his employment was terminated was offensive to due process.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff, Sidney Sament, M.D., was initially employed by the defendant Hahnemann Medical College and Hospital of Philadelphia as an assistant professor of medicine on July 1, 1970. His term of employment, as was the case for all faculty appointments, was for a period of one academic year, i. e. from July 1 to the following June 30. Plaintiff's duties as a faculty member included teaching both at Hahnemann and at Philadelphia General Hospital. Additionally, as an assistant professor and a member of the active staff, he had full admitting privileges at Hahnemann.

Plaintiff subsequently was reappointed to defendant's faculty for the 1971–72 and 1972–73 academic years, on each occasion signing a one-year contract.[1] On September 26, 1972, Wilbur Oaks, M.D., then acting chairman of defendant's department of medicine, wrote plaintiff a letter advising him that because of administrative and fiscal reorganization, Dr. Sament would not be reappointed to the Hahnemann faculty for the following academic year, and that his employment would cease as of June 30, 1973. Dr. Oaks again wrote to plaintiff on March 22, 1973, and informed him that the Faculty Affairs Committee had reviewed and approved his non-reappointment. On April 25, 1973, Dr. Joseph R. DiPalma, a vice-president and dean at Hahnemann, ad-

---

1. Paragraph 3 of the contract of employment between the parties for the 1972–73 academic year states:

TERM OF EMPLOYMENT—The term of this employment shall be for the period commencing July 1, 1972, to June 30, 1973.
Exhibit "A" of the Complaint.

vised plaintiff in writing that the Academic Affairs Council also had approved his non-reappointment. Finally, defendant's board of trustees met on May 30, 1973, and approved the non-reappointment of four faculty members, one of whom was Dr. Sament.

On June 19, 1973, invoking the jurisdiction of this court pursuant to the Civil Rights Act of 1871, 42 U.S.C. § 1983, plaintiff instituted the present action seeking injunctive relief and damages. Specifically, plaintiff alleged that his non-retention, without a hearing or adequate reasons, constituted state action within the meaning of the Fourteenth Amendment violative of his right to procedural due process. Defendants thereafter moved, pursuant to Rule 12 of the Federal Rules of Civil Procedure, to dismiss the complaint for lack of subject matter jurisdiction and failure to state a claim upon which relief could be granted. Defendants' basic arguments were that (1) the non-reappointment of Dr. Sament violated no right guaranteed by the Fourteenth Amendment, and that they amply accorded him any rights of due process to which he was entitled; and (2) as a private, non-profit corporation, Hahnemann's conduct failed to satisfy the requisites for state action.

At a hearing before me on July 6, 1973, plaintiff sought preliminary injunctive relief in the form of an order reinstating him to defendant's faculty. At the conclusion of that proceeding, at which plaintiff was the sole witness, I denied both his request for a temporary restraining order and the defendants' motion to dismiss (N.T. July 6, 1973, at 67). Following the July, 1973, hearing, both sides pursued various avenues of discovery.

Again asserting fundamentally the same propositions espoused in their motion to dismiss, defendants now move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. While neither asserting the existence of any genuine issue of material fact, which would automatically render summary judgment inappropriate in this action, nor moving for summary judgment himself, plaintiff maintains that his nonretention was state action violative of due process. I find no disputed factually material issues. Accordingly, I shall resolve the instant motion solely on the questions of law.

## II. STATE ACTION CLAIM

### A. Some General Considerations

■ "While the principle that private action is immune from the restrictions of the Fourteenth Amendment is well established and easily stated, the question whether particular conduct is 'private,' on the one hand, or 'state action,' on the other, frequently admits of no easy answer." *Jackson v. Metropolitan Edison Company,* 419 U.S. 345, 349–50, 95 S.Ct. 449, 453, 42 L.Ed.2d 477, 483 (1974); see *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 172, 92 S.Ct. 1965, 1971, 32 L.Ed.2d 627, 636 (1972); *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 723, 81 S.Ct. 856, 860, 6 L.Ed.2d 45, 51 (1961). Nonetheless, as Judge Aldisert recently observed, decisions in which the Supreme Court has "pierced the seemingly impenetrable veil of private, individual conduct to find state action" lend themselves to ready categorization into three broad groupings: (1) where state courts enforced an agreement affecting private parties;[2] (2) where the state significantly involved itself with the private party; and (3) where there was private performance of a government function.[3] *Magill v. Avonworth Baseball Conference,* 516 F.2d 1328, 1331 (3d Cir.

---

**2.** *Shelley v. Kraemer,* 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948), is, of course, the classic case in this area. There the Court held that enforcement by Georgia courts of private, racially restrictive covenants against black purchasers of land constituted state action repugnant to the Fourteenth Amendment.

**3.** See, e. g., *Evans v. Newton,* 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966) (municipal park); *Terry v. Adams,* 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953) (election); *Marsh v. Alabama,* 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946) (company town); *Nixon v. Condon,* 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984 (1931) (election).

1975); see 19 Wayne L.Rev. 1309, 1310–12 (1973).

Plainly the case *sub judice* must fit, if at all, within the second category. The criteria for ascertaining whether a state has "significantly" involved itself in the conduct of a private party has itself undergone an evolutionary change in recent years. Older cases held that the state's involvement in the challenged activity need not

> . . . be either exclusive or direct. In a variety of situations the Court has found state action of a nature sufficient to create rights under the Equal Protection Clause even though the participation of the State was peripheral, or its action was only one of several co-operative forces leading to the constitutional violation.

*United States v. Guest,* 383 U.S. 745, 755, 86 S.Ct. 1170, 1177, 16 L.Ed.2d 239, 248 (1966).[4] Since the advent of *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), a more rigorous standard has governed cases in which state action is alleged. In *Moose Lodge* the allegation of

state action was grounded upon the state liquor control board's licensing of a private social club, and the alleged Constitutional violation arose from that club's refusal to serve blacks. Writing for the Court, Mr. Justice Rehnquist held that "state action" requires that the state must "significantly involved itself with invidious discriminations." *Id.* at 173, 92 S.Ct. at 1971, 32 L.Ed.2d at 637. Significant involvement, he went on to explain, exists only where a state and private party enter into a "symbiotic relationship" conferring mutual benefits, in which the parties are sufficiently close that the state can be said "in a realistic sense" to be the "partner" of the private party.[5] *Id.* at 175–77, 92 S.Ct. at 1972–73, 32 L.Ed.2d at 638–639. Applying this test to the facts of *Moose Lodge,* the Court concluded that the regulatory process embodied in the form of the liquor control board failed to generate or create a "symbiotic relationship" or to significantly involve the state with the club's invidious discrimination.[6] *Id.* at 177, 92 S.Ct. at 1973, 32 L.Ed.2d at 639.

**4.** Under this standard, courts found state action in such disparate factual situations as the leasing of space within a public parking facility to a private restaurant, *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); the association of a state with a private institution in a manner suggesting state approval of the institution's discriminatory policies, *Commonwealth of Pennsylvania v. Brown,* 270 F.Supp. 782 (E.D. Pa. 1967), aff'd, 392 F.2d 120 (3d Cir.), cert. denied, 391 U.S. 921, 88 S.Ct. 1811, 20 L.Ed.2d 657 (1968); a city's retention of a reversionary interest in two formerly municipal golf courses after their sale to private owners, *Hampton v. City of Jacksonville,* 304 F.2d 319 (5th Cir. 1962); and municipal sponsorship of a bicentennial corporation, *Leslie v. Philadelphia 1976 Bicentennial Corporation,* 332 F.Supp. 83 (E.D. Pa. 1971).

For a comprehensive survey of the broad spectrum of cases where state action was found under the formulation enunciated in *United States v. Guest,* 383 U.S. 745, 755, 86 S.Ct. 1170, 1177, 16 L.Ed.2d 239, 247 (1966), see *Isaacs v. Board of Trustees of Temple University,* 385 F.Supp. 473, 484–85 (E.D. Pa. 1974).

**5.** Even under this standard the Court seems not to embrace the theory of state action espoused by Judge Henry Friendly in dicta in *Powe v. Miles,* 407 F.2d 73 (2d Cir. 1973). Under Judge

Friendly's view, to support a finding of state action,

> the state must be involved not simply with some activity of the institution alleged to have inflicted injury on a plaintiff but with the activity that caused the injury. Putting the point another way, the state action, not the private action, must be the subject of the complaint.

*Id.*

For a succinct critique of the weaknesses of this approach, see *Isaacs v. Board of Trustees of Temple University,* supra at 490.

**6.** Mr. Justice Rehnquist took great pains to distinguish *Moose Lodge* from *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), which prior to 1972 had been the leading teaching in the area of state action. The distinction turned, in the Court's view, on the "symbiotic relationship" between the City of Wilmington, which owned the parking authority building, and the private restaurant located in a portion of the structure leased from the authority,

> where the private lessee obtained the benefit of locating in a building owned by the state-created parking authority, and the parking authority was enabled to carry out its primary public purpose of furnishing parking space by advantageously leasing portions of

The Court applied the *Moose Lodge* analysis in *Jackson v. Metropolitan Edison Company,* supra, a suit against a privately owned and operated utility corporation which held a certificate of public convenience issued by the Pennsylvania Utilities Commission. Plaintiff sought to recover damages under the Civil Rights Act for the utility company's termination of her electric service allegedly without affording her notice, a hearing, or an opportunity to pay amounts owed. Affirming the dismissal of the complaint for lack of "state action," the Supreme Court, again speaking through Mr. Justice Rehnquist, held where a customer showed no more than that the utility was heavily regulated with a partial monopoly and that it terminated service in a manner which the utilities commission found permissible under state law, Pennsylvania was insufficiently connected with the challenged termination to make the utility's conduct attributable to the state for Fourteenth Amendment purposes. 419 U.S. at 351–53, 95 S.Ct. at 457, 42 L.Ed.2d at 484–485.

## B. Hahnemann and State Action

That contacts exist between Hahnemann Medical College and Hospital, Pennsylvania, and the federal government is indisputable. Hahnemann was chartered by the Commonwealth. From 1970 to 1973, defendant participated in the Hill-Burton program,[7] and received federal funds allocated and administered for rebuilding and enlargement projects. During the same period of time, Hahnemann also provided services under the Federal Health Insurance for the Aged program,[8] and was bound by the applicable regulations of the Social Security Administration. From 1967 to 1973, defendant contracted with the City of Philadelphia to provide medical care and services to patients at Philadelphia General Hospital (PGH),[9] under which arrangement Hahnemann appointed members of its faculty to the staff of PGH, and in return, the City reimbursed defendant dollar for dollar for its services and appointment. Hahnemann also has been the recipient of monies from the City and the Commonwealth, both of which have required an accounting for the use of such funds. Not surprisingly, funding by the federal government and the Commonwealth plays more than a nominal role in determining the size and composition of each class matriculating at Hahnemann,[10] and although it takes no di-

the building constructed for that purpose to commercial lessees such as the owner of the Eagle Restaurant. Unlike *Burton,* the Moose Lodge building is located on land owned by it, not by any public authority. Far from apparently holding itself out as a place of public accommodation, Moose Lodge quite ostentatiously proclaims the fact that it is not open to the public at large. Nor is it located and operated in such surroundings that although private in name, it discharges a function or performs a service that would otherwise in all likelihood be performed by the State. In short, while Eagle was a public restaurant in a public building, Moose Lodge is a private social club in a private building. *Moose Lodge v. Irvis,* 407 U.S. 163, 175, 92 S.Ct. 1965, 1972, 32 L.Ed.2d 627, 638 (1972).

7. See 42 U.S.C. §§ 291 et seq.

8. See 42 U.S.C. §§ 1395 et seq.

9. The city, which, of course, is itself chartered under the laws of the Commonwealth of Pennsylvania, is responsible for administering PGH. This supervision is largely accomplished through the control which the office of the mayor exercises, pursuant to the Home Rule Charter, over the selection of the trustees of PGH. See also 53 P.S. § 13601.

10. Dr. DiPalma noted that many Pennsylvania legislators are proposing not to fund out of state students enrolled by the medical schools. Mr. Walker noted to the Council at a recent meeting of the administrators of the medical schools the problem of residency had been discussed. He stated that the Education Department of the State of Pennsylvania's policy concerning residency is that a student must have twelve months of residency in the state which has not been used for education, for certification. Dr. DiPalma noted that all other medical schools in the Philadelphia area are increasing their ratio of Pennsylvania candidates versus non-Pennsylvania candidates in their freshman classes. Dr. Cameron informed the Council that this is a very poor compromise, in that medical schools should select the best possible candidates regardless of state residency, but we must knuckle down to the realities as directed by the State of Pennsylvania to increase Pennsylvania students in the entering class.

rect part in the selection of students admitted to Hahnemann Medical College, Pennsylvania has reserved the right to approve a medical certificate required of all accepted applicants.[11]

▪ Quite clearly, defendant's being chartered by the Commonwealth is of no significance. The granting of a corporate charter is a ministerial governmental function, and does not involve the state to any appreciable degree in either the management or the promotion of a chartered corporation. *Trustees of Dartmouth College v. Woodward,* 4 Wheat. (17 U.S.) 518, 635–39, 4 L.Ed. 629, 658–659 (1819); *Greenya v. George Washington University,* 167 U.S. App.D.C. at 383, 512 F.2d 556 (1975); *Blackburn v. Fisk University,* 443 F.2d 121 (6th Cir. 1971).[12] Moreover, with the possible exception of racial discrimination by recipients of government funds, mere financial support for particular projects represents insufficient state involvement to trigger Constitutional guarantees for those dealing with the recipient. *Greenya v. George Washington University,* supra, 167 U.S.App. D.C. at 384, 512 F.2d at 561.[13] Similarly, contacts with a municipality—here defendant's arrangement with the City of Philadelphia with respect to the provision of services to PGH—are insufficient in and of

themselves to constitute state action, cf. *Grafton v. Brooklyn Law School,* 478 F.2d 1137 (2d Cir. 1973), although they may be considered in the overall context of a relationship between a private party and the state, see, e. g., *Burton v. Wilmington Parking Authority,* supra; *Rackin v. University of Pennsylvania,* 386 F.Supp. 992 (E.D.Pa. 1974). Finally, the commonwealth's reservation of the right to approve the medical certificates of matriculating students is merely a ministerial exercise of its police power rather than any extensive participation or involvement in the selection of students, compare *Isaacs v. Board of Trustees of Temple University,* 385 F.Supp. 473, 488 (E.D.Pa.1974).

▪ Although no single factor just recited can be said to constitute state action, it is necessary to determine whether in combination they paint a picture of overall involvement by the state in Hahnemann's activities or of a "symbiotic relationship" wherein defendant and the state can be said to be "partners." See *Burton v. Wilmington Parking Authority,* supra, 365 U.S. at 725, 81 S.Ct. at 862, 6 L.Ed.2d at 52; *Braden v. University of Pittsburgh,* 477 F.2d 1 (3d Cir. 1973); *Rackin v. University of Pennsylvania,* supra.

> Dr. DiPalma noted that the state has requested the Deans of the Penna. medical schools to make proposals for support of medical schools. Mr. Paxson supported the proposal for increasing the. number of Pennsylvania residents in the entering class. Dr. Moyer informed the Council that the Pennsylvania legislators feel that since Pennsylvania residents are supporting medical education by means of their taxes, then their children should be educated at the medical schools, not students from outside the state.
>
> Minutes of Hahnemann Medical College Council Meeting, January 4, 1972.

11. See the Hahnemann Medical College Catalog for 1972–74.

12. By way of comparison, although state action normally does not arise from the grant of a tax exemption, see *Browns v. Mitchell,* 409 F.2d 593 (10th Cir. 1969), it has been found on that basis where there are allegations of racial discrimination, see, e. g., *Falkenstein v. Dept. of Revenue,* 350 F.Supp. 887 (D.Or.1972) (three-

judge court), appeal dismissed, 409 U.S. 1099, 93 S.Ct. 907, 34 L.Ed.2d 681 (1973); *Jackson v. Statler Foundation,* 496 F.2d 623 (2d Cir. 1974).

13. Compare *Wahba v. New York University,* 492 F.2d 96 (2d Cir.), cert. denied, 419 U.S. 874, 95 S.Ct. 135, 42 L.Ed.2d 113 (1974), with *Simkins v. Moses H. Cone Memorial Hospital,* 323 F.2d 959 (4th Cir. 1963) (en banc), cert. denied, 376 U.S. 938, 84 S.Ct. 793, 11 L.Ed.2d 659 (1964).

Judge Henry Friendly has suggested with some degree of persuasion that "racial discrimination is so peculiarly offensive and was so much the prime target of the Fourteenth Amendment that a lesser degree of involvement may constitute 'state action' with respect to it than would be required in other contexts . . . ." *Coleman v. Wagner College,* 429 F.2d 1120, 1127 (2d Cir. 1970) (Friendly, J., concurring). But see *Isaacs v. Board of Trustees of Temple University,* 385 F.Supp. 473, 485 n.11 (E.D.Pa.1974).

In *Braden v. University of Pittsburgh,* supra, the Court of Appeals for this Circuit vacated the dismissal of an action brought by a female assistant against the university and chancellor for alleged discrimination. Citing certain "notable" deficiencies in the record, the appellate court remanded the case to the district court for the compilation of a comprehensive record setting forth in detail the relationship between the university and the Commonwealth of Pennsylvania. 477 F.2d at 5.[14] In determining whether the symbiotic relationship spoken of in *Burton, Braden,* and other cases exists here, I am guided by two cases decided in this District in 1974.

In *Isaacs v. Board of Trustees of Temple University,* supra, two former members of the faculty of Temple University who contended that they had been discharged for voicing their opinions concerning the school's publication policies, sought redress in a civil rights action. In a most comprehensive and scholarly opinion, Judge Higginbotham concluded that by reason of Temple's statutory incorporation into the Commonwealth's system of higher education, a substantial representation of the state on the university's board of trustees, and the massive financial subsidies bestowed upon the school to enable it to provide relatively inexpensive higher education to Pennsylvania residents, all of Temple's actions, including its termination of the plaintiffs' employment, merited classification under the rubric of state action. *Id.* at 487–89. *Isaacs* is plainly distinguishable from the case at bar. Hahnemann is by no means as intimately entwined in the Pennsylvania system of higher education as Temple, nor is it intended to be. No comparable statute incorporates Hahnemann into Pennsylvania's educational scheme, nor are a portion of its trustees appointed through the Commonwealth's elected officials. The state does not provide a disproportionate share of Hahnemann's funds as compared with similar private institutions and enjoys no right of review over the school's budget. In short, none of the criteria deemed crucial in *Isaacs* for qualifying Temple's conduct as state action are present here.

A somewhat closer, albeit distinguishable, case is *Rackin v. University of Pennsylvania,* 386 F.Supp. 992 (E.D.Pa.1974), decided a month after *Isaacs.* There Judge Weiner found a number of contacts between the Commonwealth and the University of Pennsylvania, including tax exemptions, scholarships and loans, government support of research projects, ties to the city, and the construction, leasing and financing of buildings. Conceding that individually each factor might be insufficient to establish state action, Judge Weiner nevertheless concluded that in combination such contacts were sufficient to demonstrate that the Commonwealth had so far insinuated itself into a position of interdependence with the university as to make it a joint partner in any alleged sexual discrimination in employment. *Id.* at 1004–05.

The contacts dealt with in *Rackin,* although present in the case at bar, are far less substantial than those between the Commonwealth and the University of Pennsylvania. For example, in 1973, the state appropriated $14,368,000. for the university [15] whereas Hahnemann by comparison received only $2,707,000.00 [16] in Commonwealth appropriations. Similarly, the General State Authority (GSA) [17] and

14. On remand, the district court concluded, inter alia, that the Commonwealth had insinuated itself into a position of interdependence with the university, and accordingly that the school was acting under color of state law when it engaged in the challenged activity. See *Braden v. University of Pittsburgh,* 392 F.Supp. 118 (W.D.Pa.1975).

15. See *Rackin v. University of Pennsylvania,* 386 F.Supp. 992, 996–97 (E.D.Pa.1974).

16. Letter dated February 10, 1975, from Andrew S. Price, Esquire, to Michael Goldman, Esquire, item 6 with exhibit.

17. Judge Weiner has succinctly characterized the role of the GSA as follows:

The General State Authority (hereinafter "GSA"), legislated into existence in 1949 and authorized to assist "State-aided" institutions in 1955, has been the Commonwealth's primary instrumentality in financing large

the Pennsylvania Higher Educational Facilities Authority (PHEFA) constructed, financed, or leased at least fourteen buildings of the University of Pennsylvania, 386 F.Supp. at 998–99, while those agencies were similarly involved in only five of Hahnemann's buildings.[18] Much more significantly, in the instant case there is no evidence that the Commonwealth maintains a "stranglehold" on Hahnemann, with a corresponding potentially significant input into its policies, both of which Judge Weiner found to be the case with respect to the University of Pennsylvania. 386 F.Supp. at 1005.

 For these reasons, then, I am persuaded that even in combination, the contacts between the state and Hahnemann are insufficient to constitute the kind of symbiotic relationship with which the *Burton* and *Braden* courts were concerned. Accordingly, I conclude that Hahnemann's nonreappointment of Dr. Sament cannot be deemed to be state action within the meaning of the Fourteenth Amendment or the civil rights statute.[19]

## III. DUE PROCESS CLAIM

Having concluded that Dr. Sament's nonreappointment cannot be characterized as state action, I could quite logically terminate this opinion at this juncture. In the

interest of expediting the disposition of this case, however, should a reviewing court disagree with my conclusion regarding state action, I shall now proceed to consider the second prong of plaintiff's claim, viz., that his non-retention constituted a violation of due process. Proceeding on two distinct theories, Dr. Sament posits first that he had a property interest in his position at Hahnemann entitling him to due process, a right not accorded him by virtue of defendant's failure to state adequate reasons for his nonreappointment or to afford him an opportunity to be heard. Alternatively, plaintiff contends that Hahnemann's failure to comply with its by-law provisions concerning timely notification was in and of itself a Constitutional violation.

A. Property Interest and the Process which Is Due

Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

*Arnett v. Kennedy,* 416 U.S. 134, 151, 94 S.Ct. 1633, 1643, 40 L.Ed.2d 15, 32 (1974),

scale capital improvement projects for public buildings. Prior to 1963 in order for the GSA to construct a University facility, which would be financed by tax-exempt bonds issued by the GSA, the Trustees of the University were first required to convey fee simple absolute title to the tract of land and building to the GSA for $1.00. The GSA would then lease the property to the Pennsylvania Department of Public Instruction (now the Department of Education and hereinafter "Department") at an annual rent sufficient to amortize the bonds. The funds required to pay this rental were derived from the Department's annual appropriation. Finally, the Department with the approval of the Governor of the Commonwealth would sublease the facility to the "State-aided" institution for $1.00 per year.

*Rackin v. University of Pennsylvania,* note 15 supra, 386 F.Supp. at 998.

**18.** GSA has title to the Bobst College, and Klohr Buildings and the land thereunder, while PHEFA enjoys a similar position with the

Windsor and Student Towers. The land under each of these buildings was deeded to the governmental agencies by Hahnemann. Hahnemann pays rent for each of the buildings and after a given period of time, title will pass from the state agency to the medical college and hospital. Letter dated February 10, 1975, from Andrew S. Price, Esquire, to Michael Goldman, Esquire, supra note 16, ¶ 9.

Hahnemann has purchased no buildings from either the City of Philadelphia or the Commonwealth of Pennsylvania. *Id.*

**19.** Inasmuch as I have concluded that marked factual dissimilarities exist between *Rackin* and the instant case, nothing in this opinion should be construed as attempting to overrule anything said there by Judge Weiner. Compare *Fried v. Feola,* 129 F.Supp. 699 (W.D.Pa.1955), with *Close v. Calmar Steamship Corp.,* 44 F.R.D. 398 (E.D.Pa.1968), aff'd sub nom., *Blake v. Farrell Lines, Inc.,* 417 F.2d 264 (3d Cir. 1969).

quoting *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548, 560 (1972); see also *Roseman v. Hassler,* 382 F.Supp. 1328 (W.D.Pa.1974), aff'd sub nom., *Roseman v. Indiana University of Pennsylvania, at Indiana,* 520 F.2d 1364 (3d Cir. 1975).

■ It is well-settled that "a party cannot rest on the allegations contained in his complaint in opposition to a properly supported summary judgment motion made against him." *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569, 592 (1968); *Kaiser v. General Motors Corp. (Pontiac Motor Div.),* 396 F.Supp., 33, 37 (E.D.Pa.1975); *Drake Motor Lines, Inc. v. Highway Truck Drivers and Helpers Local No. 107,* 343 F.Supp. 1130 (E.D.Pa.1972). Rather, he must produce some evidence to establish the existence of facts which will support his allegations. A careful review of the pleadings, exhibits, and testimony adduced at the preliminary injunction hearing in this case, however, convincingly establishes that plaintiff has produced no evidence whatsoever in support of his bold allegations of a property interest in his position at Hahnemann or of the variety of de facto tenure recognized in *Perry v. Sindermann,* 408 U.S. 593, 599–602, 92 S.Ct. 2694, 2698–2700, 33 L.Ed.2d 570, 578–580 (1972). Compare *Chung v. Park,* 514 F.2d 382, 385–86 n.6 (3d Cir. 1975), petition for cert. docketed, 44 U.S.L.W. 3254 (filed Sept. 8, 1975).

Quite to the contrary, the written terms of plaintiff's one-year contract specifically provided that his right of employment ended on June 30, 1973, his last day of work, see note 1 supra. Even more importantly, since the college's by-laws provide that all faculty members are subject to annual re-

appointment by the board of trustees,[20] plaintiff could not reasonably have entertained any expectation of tenure. Rather, as plaintiff's own testimony at the hearing on his motion for a preliminary injunction poignantly illustrates, he had no more than a mere subjective expectancy of continued employment by Hahnemann. A portion of plaintiff's cross-examination by A. Grant Sprecher, Esquire, defendant's attorney, was as follows:

Mr. Sprecher: Well, you have attached to your Complaint as Exhibit "C", part of the By-Laws, have you not, which covers non-reappointments?

Dr. Sament: Yes, sir.

Mr. Sprecher: All right. And did you understand the procedure for non-reappointment at the time that you came to Hahnemann or rather shortly thereafter?

Dr. Sament: I believe I did.

Mr. Sprecher: Did you understand that you could be non-reappointed?

Dr. Sament: I believe I did understand there was that possibility, although not a likelihood. I accepted the fact that the usual procedure is for candidates to be reappointed.

Mr. Sprecher: Well, there are other persons who have been occasionally from time to time not reappointed at Hahnemann, is that so?

Dr. Sament: I believe so.

Mr. Sprecher: Indeed, you are aware that there are others this year who were not reappointed at Hahnemann?

Dr. Sament: Yes.

\* \* \* \* \* \*

Mr. Sprecher: And also in previous years and from time to time there have been faculty members at Hahnemann who

---

**20.** Article III, section 3 of the Hahnemann Medical College by-laws provides in part:

Members of the Faculty shall be appointed to academic office and rank for the term of one year, but shall be subject to dismissal for cause earlier as provided in section 4 of this Article.

Reappointments shall be considered by the Board of Trustees before the commencement

of the next official college year. Unless it is recommended that they shall not be reappointed, members of the Faculty ordinarily will be reappointed unless they have resigned, retired or have been discharged for cause.

\* \* \* \* \* \*

Exhibit "C" of the Complaint.

have not been reappointed is that also not so?

Dr. Sament: I am aware of previous years.

\* \* \* \* \* \*

Mr. Sprecher: Well, the By-Laws do indicate there is a possibility of non-reappointment for anybody, do they not?

Dr. Sament: At that time I understand, yes.

(N.T. July 6, 1973, 22, 31.) Under such circumstances, the Supreme Court's statement in *Perry v. Sindermann,* supra, 408 U.S. at 603, 92 S.Ct. at 2700, 33 L.Ed.2d at 580 that a "mere subjective 'expectancy' " does not fall within the protection of procedural due process [21] is dispositive of Dr. Sament's "property interest" allegation.

With respect to the question of whether nonreappointment may constitute an infringement of an individual's liberty, the Supreme Court has said, "It stretches the concept too far to suggest that a person is deprived of 'liberty' when he simply is not rehired in one job but remains as free as before to seek another." *Board of Regents v. Roth,* supra, 408 U.S. at 575, 92 S.Ct. at 2708, 33 L.Ed.2d at 560; see *Cafeteria Workers v. McElroy,* 367 U.S. 886, 895–96, 81 S.Ct. 1743, 1748–49, 6 L.Ed.2d 1230, reh. denied, 368 U.S. 869, 82 S.Ct. 22, 7 L.Ed.2d 70 (1961). Here not only was plaintiff free to seek new employment, he has commendably exercised that freedom to the extent that today, as disclosed by discovery and conceded by his attorney at oral argument on the instant motion, he enjoys staff privileges at numerous hospitals and medical centers and actively engages in the practice of medicine. He maintains two separate offices, and earns an annual income substantially in excess of the salary he received as an employee of the defendant. In short, there is no evidence that Hahnemann's decision not to reappoint plaintiff to its faculty for the 1973–74 academic year either impaired his standing and association in the community or reflected adversely upon his good name, reputation, honor or integrity.

A nontenured teacher may be discharged for no reason or for any reason not impermissible in itself or as applied, *Kaprelian v. Texas Woman's University,* 509 F.2d 133, 139 (5th Cir. 1975), and he has no Constitutional right to a statement of reasons [22] or a hearing on a university's decision not to rehire him, *Frazier v. Curators of University of Missouri,* 495 F.2d 1149, 1152 (8th Cir. 1974); *Freeman v. Gould Special School District,* 405 F.2d 1153 (8th Cir.), cert. denied, 396 U.S. 843, 90 S.Ct. 61, 24 L.Ed.2d 93 (1969). Plaintiff having failed to show an interest in his position rising to the level of tenure or its equivalent, it therefore follows that he was entitled neither to a statement of the reasons for his nonretention nor an opportunity to be heard.

**B. Hahnemann's Compliance With Its By-Laws**

Article III, Section 8 of the by-laws of Hahnemann Medical College provides that "[i]f approved by the Board, the faculty member shall be informed in April that he will not be reappointed for the next official college year." Plaintiff asserts that his final notice of non-reappointment-dated May 30, 1973—therefore was untimely and of Constitutional import.

---

**21.** Touching on this question in *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548, 561 (1972), the Court stated:

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.

**22.** Plaintiff here was, of course, advised by Hahnemann of the reason for his nonretention. He was told that the school's decision was "due to some administrative and fiscal reorganization." Although my disposition of this case makes it unnecessary for me to consider plaintiff's assertion that the phrase "administrative and fiscal reorganization" requires elaboration, I note with interest that at least one court has held that where a lack of funds necessitates a sizeable faculty reduction, it is peculiarly within the province of the school administration to determine which teachers should be released and which retained. See *Levitt v. Board of Trustees of Nebraska State College,* 376 F.Supp. 945, 950 (D.Neb.1974).

For two reasons, I reject this argument. First, a fair reading of the operative language of article III, section 8, and logic itself lead to the inescapable conclusion that a faculty member who is not to be reappointed can be notified *if and only if* the trustees have considered his non-reappointment at or before that time. The by-laws neither require the Board of Trustees to act in April nor preclude it from giving earlier or later notice regarding the non-reappointment of staff members. Here the Board did not consider or approve faculty non-reappointments until May 30, 1973,[23] at which time Dr. Sament and the three other faculty members who were not reappointed were given final notification. Secondly, it is of more than passing significance that, as plaintiff concedes, he had been put on notice in September of 1972 by his department chairman, Dr. Wilbur Oaks, that he would not be reappointed for the 1973–74 academic year commencing July 1, 1973. This initial communication was followed by letters from his department chairman on March 22, 1973,[24] and the dean of the college,[25] confirming that he would not be reappointed. Under these circumstances, and in the absence of any showing of prejudice by the plaintiff, I conclude that the delay was not crucial and is by no means of Constitutional dimensions. Cf. *Zeller v. Donegal School District Board of Education,* 517 F.2d 600 (3d Cir. 1975), citing *Polite v. Diehl,* 507 F.2d 119, 141 (3d Cir. 1974) (Kalodner, J., dissenting).

## IV. CONCLUSION

For the reasons set forth in Part II, supra, I find that because the contacts between Hahnemann Medical College and Hospital and the Commonwealth of Pennsylvania were insufficient to constitute a symbiotic relationship, defendant's non-reappointment of plaintiff to its faculty cannot be deemed to be state action within the meaning of the Fourteenth Amendment or the Civil Rights Act. Even if Hahnemann's conduct could be characterized as state action, however, for the reasons expressed in Part III, supra, I conclude that plaintiff had no right either to a statement of the reasons for his non-retention or to the opportunity to be heard, and that any variance between defendant's by-laws and its notification to plaintiff of his non-reappointment was not of Constitutional dimensions. Defendant's motion for summary judgment accordingly will be granted.

---

**23.** The Board of Trustees did meet on April 25, 1973, but because of the unavailability of trustee A. Kohn Sprenkle, the chairman of the board's committee on academic affairs, deferred consideration of the various proposed non-reappointments until its next meeting, on May 30, 1973. Exhibit D–1 (April 25, 1973, Minutes of the Executive Committee of the Board of Trustees) 3–4. At that meeting, Mr. Sprenkle presented his non-reappointment report which subsequently was adopted. Exhibit D–2 (Minutes of the Annual Meeting of the Board of Trustees).

**24.** Exhibit P–4, preliminary injunction hearing.

**25.** Exhibit P–6, preliminary injunction hearing.