**Joseph V. BROGAN, Ph.D.**

v.

**LA SALLE UNIVERSITY, et al.**

No. Civ.A. 98–6087.

United States District Court,
E.D. Pennsylvania.

Oct. 14, 1999.

557

Robin A. Bolacker–Feeney, Sacks, Weston, Smolinsky & Albert, Philadelphia, PA, for plaintiff.

John C. Wright, Montgomery, McCracken, Walker & Rhoads, LLP, Philadelphia, PA, for defendant.

## MEMORANDUM

DALZELL, District Judge.

Plaintiff Joseph V. Brogan, a tenured professor, has sued his employer, LaSalle University, as well as many individual de-

fendants,[1] for sex discrimination under .42 U.S.C. § 2000e, civil rights violations under 42 U.S.C. § 1983, and related state claims of defamation, negligent and intentional infliction of emotional distress, breach of contract, and negligent and intentional interference with contract. Brogan's case arises out of LaSalle's removing him as Chair of his department, in the course of granting tenure to a female colleague who Brogan believed did not deserve that promotion.

After the close of discovery, defendants moved for summary judgment and Brogan has responded. For the reasons set forth below, we will grant summary judgment as to Count I of the Complaint, comprising Brogan's Title VII and § 1983 claims, and will also dismiss his related state law claims, contained in Counts II–V, pursuant to 28 U.S.C. § 1367(c).

## I. *Facts*

The facts necessary to dispose of the motion are largely undisputed. Dr. Brogan became a faculty member at LaSalle University in 1978, and earned tenure as an Assistant Professor of Political Science in 1993. On July 1, 1995, he was appointed Chair of the political science department,[2] with his term as Chair to end on June 30, 1999. On May 30, 1997, Brogan received a letter from Provost Joseph Kane informing him that he was being terminated as Chair of the political science department, effective a month later. Provost Kane stated that the reason for the termination was Brogan's refusal to respond to, or cooperate in the investigation of, allegations of discrimination that Mary Ellen Balchunis–Harris, a member of the political science faculty,[3] had made against Brogan.

Balchunis–Harris had joined the political science faculty in 1991. The collegial relationship between Balchunis–Harris and Brogan evidently was strained almost from the outset,[4] and in December, 1995, shortly after Brogan's appointment as Chair, Barbara Millard, Dean of the School of the Arts and Sciences, conducted a mediation between Brogan and Balchunis–Harris.[5] In the Fall of 1996, Balchunis–Harris was due for tenure review, and on October 15, 1996, Brogan informed Balchunis–Harris that the political science department had voted not to recommend her for either tenure or promotion.[6] That same day, Balchunis–Harris wrote a letter to Provost Joseph Kane stating that both Brogan and Ken Hill, the former political science department Chair, were biased against her;[7]

---

1. Including LaSalle's President, other members of its administration, a faculty member, and the Board of Trustees.

2. The political science department at LaSalle comprised four faculty members.

3. Balchunis–Harris was the only female department member.

4. For instance, Balchunis–Harris claimed that she had an unpleasant lunch meeting with Brogan, during which he expressed concerns about what he had been told about her teaching. This occurred in February, 1992, three years before Brogan's appointment as department Chair.

5. The mediation stemmed from Balchunis–Harris's claim that she was subject to, *inter alia*, a hostile environment, harassment by memoranda, and a lack of support, and that she felt she was being held to a different standard than other department members. For his part, Brogan was concerned with, *inter alia*, the syllabi and texts of Balchunis–Harris's classes, her lack of presence on campus for office hours, and her ability to attend departmental meetings. It is worth noting that Balchunis–Harris's allegations did not contain an explicit claim that Brogan's behavior was motivated by sex.

6. Though Balchunis–Harris was of course not informed of this at the time, the vote was two to one among the faculty, with Brogan in the majority.

7. The letter included details of two incidents involving Professor Hill that arguably amounted to sexual harassment, and Balchunis–Harris enclosed a copy of a memo from her to Brogan, dated November 12, 1995, that contained some of the allegations that had been mediated by Dean Millard in December of that year. The letter contained

Balchunis–Harris requested a review of the tenure recommendation decision and the process by which it was reached.

Balchunis–Harris's allegations sparked a protracted inquiry. She had several meetings with members of the administration, which included Dean Millard, Provost Kane, and Rose Lee Pauline, the University's affirmative action officer. Balchunis–Harris also supplied the administration with at least three additional memoranda, the last dated December 16, 1996, detailing the alleged discrimination and harassment as it had occurred since her 1991 hiring.[8] Although Brogan was informed by Provost Kane in early November, 1996 that Balchunis–Harris's tenure process had been suspended because of concerns she had voiced about the process, he was not informed that there was an investigation into his treatment of her.[9]

Because Brogan's claims of invidious discrimination are largely predicated upon a heavily documented record, it is necessary for us now to canvass much of the correspondence between Brogan and the LaSalle administration during the period in question.

On January 14, 1997, Provost Kane first informed Brogan that there was indeed an investigation in progress as a result of the allegations regarding Brogan's sexual discrimination. Kane asked Brogan to meet with him and Dean Millard in order to discuss those claims. On January 21, 1997, Brogan sent a letter to Kane setting forth his understanding of the chronology of the events in Balchunis–Harris's tenure process that had led to the January 14 phone call. In his letter, Brogan requested that before any meeting he be provided with copies of all the materials that Balchunis–Harris had submitted. In this initial communication, Brogan also expressed two concerns with the procedures being used: first, he was concerned that the allegation of bias was not being addressed through the "bias" procedures provided for in the tenure review process;[10] second, he was concerned that if Balchunis–Harris's claims were in fact of "discrimination," then the University's official grievance procedure (which he felt was the appropri-

no explicit claim that Brogan's actions were motivated by her sex.

8. The memoranda cited many issues and incidents involving Brogan. In his response brief, Brogan catalogues twenty-nine separate claims. *See* Pl.'s Br. In Resp. to Defs.' Mot. For Summ.J. at 6–13 (hereinafter "Pl.'s Mem."). These allegations ranged from the serious—for example, that Brogan's differential treatment of her may have been motivated by her status as a new mother—to the less than serious—for example, that Brogan had not acknowledged an invitation to a party thrown on the occasion of Balchunis–Harris's earning her Ph.D.

9. Following the suspension of Balchunis–Harris's tenure process, and as the inquiry was ongoing, Brogan had several conversations with Provost Kane in which Kane reported that Balchunis–Harris had alleged improprieties in the tenure process. In these discussions, Brogan expressed concern that the school's procedure for dealing with bias (contained within the tenure review process) was not being used. It would appear that in at least one instance during these conversations, Kane specifically told Brogan that there was no investigation in progress when in fact there was.

10. In the tenure process, a candidate submits her dossier for review by the department. After the departmental vote, the department chair, the appropriate academic dean, and the Provost meet in a "Committee of Three" to vote on the candidate's file; if there is at least one positive vote, the file goes on for consideration by the faculty Tenure and Promotion Committee. The department chair ordinarily is required to vote the department recommendation; however, if the chair feels that the department vote was motivated by "bias," the chair may vote for the candidate in order to ensure that the candidate's file is considered by the Tenure and Promotion Committee. If the Tenure and Promotion Committee votes against the candidate, she may appeal to the Tenure and Promotion Appeals Committee, which reviews the case to ensure that fair procedures were followed, and that there was no arbitrary, capricious, or discriminatory action. The Appeals Committee reports its findings to the President; upon receipt of the report, the President meets with the Provost and the Appeals Committee, and then renders a decision regarding the appeal. *See LaSalle*

ate mechanism for addressing such a claim) was not being used. Less than a week later, Provost Kane sent Brogan most of Balchunis–Harris's documentation. The Provost also stated in his January 27 letter that the school was not employing the tenure process "bias" procedure because the claim was that sexual discrimination had tainted the tenure review process, and went on to say that the University had mandated the investigation and that Brogan's full cooperation was required.

On February 3, Provost Kane, Dean Millard, and Brogan met to discuss the allegations. During this meeting, Brogan refused to make specific responses to Balchunis–Harris's claims, though there was discussion of the materials Balchunis–Harris had submitted, as well as of the nature of the claims against Brogan and his concerns about the investigative process. The next day, Provost Kane sent a letter to Rose Lee Pauline, Assistant Vice–President for Business Affairs and the University's affirmative action officer, describing the meeting and reporting, *inter alia*, that Brogan had concerns about the process.

*University Faculty Handbook* (Pl.'s Ex. 12) at 41–49.

**11.** These included concerns that the University was not following the appropriate grievance process, that the University was tampering with the tenure process, and that there was an attempt to deny him the opportunity to defend himself. Elsewhere in the letter, Brogan suggested that the administration's conduct amounted to creating a hostile work environment for him and that the accusations had affected his work and his health.

**12.** Kane's February 10 letter reached Brogan after Brogan's February 10 letter had been drafted but before it was sent.

**13.** The official grievance procedure is separated into "formal" and "informal" review. Informal review calls for a conference between the grievant and respondent within ten days of the occurrence of the act of discrimination; if resolution is not achieved at that stage, then the issue is taken to the supervisor of either the grievant or the respondent. If this process fails, the grievance moves on to "formal" review. In formal review, the complaint is

On February 10, Brogan sent a letter to Provost Kane and Dean Millard presenting a chronology of the events that had happened, to his understanding, since October 15. In this letter, Brogan summarized his view of the February 3 meeting where he had presented a list of his concerns,[11] and requested that: (1) Balchunis–Harris's tenure process be reopened, (2) the investigation against him be ceased, and (3) there be no disclosure by the administration that there were claims of sexual discrimination made against him. Brogan also reiterated his request for additional documentation regarding the claims.

On the same day,[12] Provost Kane provided to Brogan additional documentation, and stated in his letter that Brogan would get the same time to respond to the allegations that Balchunis–Harris had received to submit her claims. The Provost reiterated that Brogan had to provide responses to the allegations and that he must follow the investigative procedure the University mandated. Brogan responded to Kane's letter the next day. Brogan again voiced his concern that the official grievance procedure[13] was not being followed. Brogan

referred to either the Affirmative Action Officer or the Director of Personnel, who determines if the conduct is "grievable"; if so, a signed form of grievance is submitted within ten days of the last meeting between the grievant and the supervisor discussing the complaint. The grievance is then submitted to a committee of three persons: an Assistant Director of Personnel appointed by the Director of Personnel, one person appointed by grievant, and one person appointed by respondent. The committee conducts fact finding and submits its report to the Director of Personnel, who then submits a report to the area Vice President or the Provost, who in turn makes a final decision. *See LaSalle University Supervisory Guide* (Defs.' Ex. 17) at LU0026–LU0029. Defendant points out that both Provost Kane and Ms. Pauline felt that the process of inquiry used with respect to this matter was in fact the informal grievance procedure, *see* Defs.' Br. In Supp. Of their Mot. For Summ.J. at 8 (hereinafter "Defs.' Mem."), though there may have been some alteration of the process in the interests of expedience, *see* Defs.' Mem. at 8, Pl.'s Mem. at 18. To the extent that there is any dispute over this, it is not material with respect to

also said that he believed Kane was trying to intimidate him with veiled threats of punishment if he did not cooperate with the investigation, and raised questions about the merits of some of Balchunis–Harris's claims.

On February 18, Provost Kane responded to Brogan,[14] noting that there was no ongoing investigation of Brogan *per se,* but rather an effort to understand what Balchunis–Harris's allegations were about and "to follow through" on them. In his February 26 letter, Brogan mentioned to Kane [15] that he was and had been willing to respond to Balchunis–Harris's allegations through the tenure and promotion process, and that his primary concern was about due process. Brogan also stated that he was requesting that the American Association of University Professors (AAUP) review the matter, and that further meetings would have to await AAUP action.

On March 4, 1997, Provost Kane responded to say that while Brogan was welcome to get an AAUP opinion, there could be no further delay in handling the matter and that the University had already been prejudiced by Brogan's delay in meeting with Kane and Dean Millard. Kane's letter set a meeting for March 14, and warned that Brogan's failure to meet at that time could result in charges of insubordination as well as risk Kane's reaching a conclusion about the allegations without hearing any contrary evidence from Brogan.

On March 10, Norma Schulman, Associate Secretary of the AAUP, wrote to Provost Kane expressing, *inter alia,* the AAUP's concerns for the integrity of the tenure and promotion process [16] and for due process for faculty members under investigation. The March 14 meeting was canceled due to Provost Kane's illness, and on March 16 Brogan wrote to Kane asking that there be a final attempt at mediation and that he allow an AAUP representative to be present at the meeting.

On March 31, a meeting was at last convened among Brogan, Provost Kane, Dean Millard, and Robert K. Moore, an AAUP representative. At the meeting, Brogan reiterated his opposition to the process being used, and refused to provide specific responses to the allegations despite Kane's renewed direction that he should do so.

On May 1, 1997, LaSalle's President Joseph F. Burke informed Balchunis–Harris that she had been granted tenure at La-Salle, a decision that bypassed the faculty Tenure and Promotion committee, and which the President did on his own prerogative.[17]

On May 30, Provost Kane sent two letters to Brogan. One letter stated that because Brogan had offered no evidence contrary to Balchunis–Harris's claims, Kane had to conclude that Balchunis–Harris had, in fact, been held to a higher standard than other faculty members. Kane noted that the evidence did not clearly show that sex was the motivator, but he mentioned that Balchunis–Harris was the lone female faculty member in the department.[18] The letter went on to warn

Brogan's federal law claims, as is shown below.

**14.** This letter explicitly did not attempt to respond to the various points raised in Brogan's letters of February 10 and 11.

**15.** This letter explicitly did not attempt to respond to any assertions and implications of Kane's letter of February 18.

**16.** That is, a concern that claims of sexual harassment be properly investigated without chilling negative tenure recommendations.

**17.** The President's action was partially driven by the fact that the University felt that if no decision was made, Balchunis–Harris, simply by virtue of her time at LaSalle, would gain "de facto" tenure under tenure guidelines to which the University subscribes. This action sparked a letter on May 9, 1999 from the AAUP to President Burke expressing that organization's concern over the grant of tenure without faculty review.

**18.** There is a dispute as to whether Brogan was found "guilty" of sex discrimination. While Kane's letter suggested that he was not,

Brogan to avoid any such behavior in the future and to remind him to keep the matter confidential, and that violation of either condition could result in discipline. The second letter terminated Brogan's appointment as Chair of the political science department based on his refusal to cooperate with his supervisors' requests during the investigation of Balchunis–Harris's claims.

On the same day, Provost Kane and Dean Millard wrote to Balchunis–Harris and informed her that (1) the investigation of her allegations had been delayed due to Brogan's unwillingness to cooperate, (2) there had been a finding that Brogan had held her to a higher standard, and (3) there had been a finding that Brogan's holding her to a higher standard had contributed to fostering a hostile work environment. The letter reported that there had been no finding that Brogan's actions were motivated by sex, although it did note that Balchunis–Harris was the only female faculty member in the department.[19]

Before he received either of Provost Kane's May 30 letters, Brogan on June 2 wrote to President Burke, Provost Kane, Dean Millard, and other members of the LaSalle administration. Copies of the letter were also sent to the executive committee of the Board of Trustees. In this letter, Brogan rehearsed his views of the procedural and factual history of the matter, and argued that the claimed unusual treatment of Balchunis–Harris's allega-tions stemmed from the fact that the accusations were made by a woman against a man and therefore constituted sexual discrimination against *him*. Brogan further stated that the letter should be considered to be a formal grievance application against President Burke, Provost Kane, Dean Millard, Rose Lee Pauline, and other members of the administration, and that a special grievance committee should be convened to hear the grievance.

Four days later, Provost Kane replied that Brogan might wish to modify his June 2 letter based on Kane's May 30 letters, stating that Brogan's "response" came too late. The Provost also asked Brogan to particularize his claim of sexual discrimination with respect to each of the people named in his letter.

On June 26, 1997, Brogan responded to Provost Kane and explained that his June 2 letter was not in fact a response to Balchunis–Harris's allegations, and that he would only respond to the charges through the tenure and promotion or grievance processes. Brogan contended that the Provost did not have the power to remove him as Chair [20] and that in any event the failure to provide a forum for him to respond to the charges limited the University's ability to terminate his Chair appointment "for cause". Brogan concluded with the claim that he had been "convicted" of sexual discrimination when there was admittedly no clear evidence of such motivation.[21]

---

deposition statements from various witnesses would permit a conclusion that Brogan was thought by members of the administration to have been found to have sexually discriminated against Balchunis–Harris, *see* Pl.'s Mem. at 19–20. As we will note below, this dispute about the minds of others is not material to Brogan's federal law claims.

**19.** Also, on that same day Provost Kane wrote to the faculty Tenure and Promotion Committee, explaining that the committee had been bypassed in Balchunis–Harris's case because the University's legal counsel had advised that any tenure review had to be delayed until after the investigation into the alleged discrimination was concluded.

**20.** Also in separate June 25 letters to President Burke and Dean Millard, Brogan made the arguments that the Provost did not have proper authority to terminate his appointment as Chair and that the "for cause" limitation on his appointment barred his dismissal at the will of the President, Provost, or Dean. In letters to Brogan dated July 1 and July 2 respectively, President Burke and Dean Millard confirmed that Provost Kane had the authority to terminate Brogan's appointment as Chair.

**21.** It is clear that Brogan's chief concern here is for his reputation. His loss of his "Chair Stipend" is around $2,000 for each of the two years of his early termination in that post.

This lawsuit followed.[22]

## II. *Sex Discrimination Claims*

Brogan alleges that but for his being a man, the "investigation/removal/retaliation by the University in violation of 42 U.S.C. § 2000e would not have occurred," Compl. at ¶ 29.

### A. *Legal Standard*[23]

Title VII of the Civil Rights Act of 1964 states that "[i]t shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual ... because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1) (1994).

Both parties agree, and we concur, that this case constitutes an "indirect" claim of sex discrimination requiring analysis under the framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Under this familiar framework, a plaintiff must first establish a *prima facie* case of discrimination; if the plaintiff successfully does so, the burden of production shifts to the defendant, who is required to articulate a legitimate, nondiscriminatory reason for the challenged employment action. *See Burdine*, 450 U.S. at 253–54, 101 S.Ct. 1089. Once such a legitimate, nondiscriminatory reason is proffered, the plaintiff must point to evidence that discredits the claimed nondiscriminatory reason or that shows beyond a preponderance of the evidence that the employer's action had a discriminatory motivating cause. *See Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1067 (3d Cir.1996) (citing *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir.1994)).

### B. *Brogan's Prima Facie Case*

■ In order to establish a *prima facie* case of discriminatory discharge, a plaintiff must show that (1) he is a member of a protected class;[24] (2) he was qualified for

---

*See* Pl.'s Exs. 9 and 11 (chair stipends of $1,839 and $2,019 in the 1995–96 and 1996–97 academic years, respectively).

**22.** In his Memorandum of Law, Brogan briefly discusses a July 5, 1997 letter response by Provost Kane to Brogan's June 26 letter; however, this letter was omitted from the exhibits and will not be considered. In any event, Brogan's Memorandum notes that in this letter Kane stated that he had nothing further to add to his previous letters, so its materiality is in any event dubious.

**23.** A summary judgment motion should only be granted if we conclude that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law," Fed.R.Civ.P. 56(c). In a motion for summary judgment, the moving party bears the burden of proving that no genuine issue of material fact is in dispute, *see Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585 n. 10, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), and all evidence must be viewed in the light most favorable to the nonmoving party, *see id.* at 587, 106 S.Ct. 1348. Once the moving party has carried its initial burden, then the nonmoving party "must come forward with 'specific facts showing there is a genuine issue for trial,'" *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348 (quoting Fed.R.Civ.P. 56(e)) (emphasis omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (holding that the nonmoving party must go beyond the pleadings to show that there is a genuine issue for trial).

The mere existence of some evidence in support of the nonmoving party will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, we must "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pennsylvania Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir.1995).

**24.** It is an interesting question whether the concept of "protected class" survives the Supreme Court's decision in *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). Since men can now unquestionably assert Title VII sex dis-

the position; and (3) he was discharged under circumstances that give rise to an inference of unlawful discrimination. *See Waldron v. SL Indus., Inc.*, 56 F.3d 491, 494 (3d Cir.1995).[25] A primary purpose of the *prima facie* case is to "eliminate the most obvious, lawful reasons for the defendant's action," *Pivirotto*, 191 F.3d 344, 352 (citing *Burdine*, 450 U.S. at 253–54, 101 S.Ct. 1089), and "[t]he central focus ... is always whether the employer is treating some people less favorably than others because of their race, color, religion, sex, or national origin." *Pivirotto*, 191 F.3d 344, 352 (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978)) (internal quotation marks omitted).

■ Defendants do not dispute that Brogan meets the first two elements for a *prima facie* case.[26] Defendants do, however, deny that Brogan has met the third element for a *prima facie* case, and, as detailed below, we agree.

While Brogan supports his allegation of sex discrimination with evidence of a number of defendants' acts, none of these, either alone or together, would support an inference of impermissible discrimination against him by reason of his sex. For

instance, Brogan argues that he was found guilty of sex discrimination solely because he was a man and the complainant was a woman, *see* Pl.'s Mem. at 30. Brogan bases this contention primarily on the statement contained in Provost Kane's letter of May 30, 1997 that "[o]n the other hand, the fact is that Dr. Balchunis–Harris is the only female member of the Department." Even assuming that Brogan was in fact "found guilty" of such "discrimination",[27] as he claims, this does not lead to an inference of sex discrimination against *him*. Balchunis–Harris was indeed the only woman under Brogan's supervision in the department, and the investigation found that *she* was treated differently than the other (male) members. Thus, the remark that Balchunis–Harris was the only woman in the department would support a claim that she had been the victim of discrimination whether the putative discriminator (here Brogan) was a man or a woman. As the Supreme Court has recently held, "nothing in Title VII necessarily bars a claim of discrimination 'because of ... sex' merely because the plaintiff and the defendant ... are of the same sex." *Oncale*, 118 S.Ct. at 1001–02, 118 S.Ct. 998.[28]

crimination claims against men and women, the entire population enjoys the statute's coverage. Mercifully, this consequence of *Oncale* does not bear on any of the issues before us here.

**25.** In *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344 (3d Cir.1999), our Court of Appeals last month held that it is not necessary for the plaintiff to show that he was replaced by a member of the opposite sex. *See id.* at 352–53. We further note that while under some prior case law a plaintiff member of a non-protected class was required to make an additional showing of background circumstances demonstrating that the employer was disposed to discriminate against such a non-protected group member, our Court of Appeals has just held that such a showing is not necessary as part of the *prima facie* case. *See Iadimarco v. Runyon*, 190 F.3d 151 (3d Cir. 1999) (holding that no such background showing was required of white plaintiff claiming racial discrimination).

**26.** That is, his male sex and that he was qualified to be Chair of the political science department.

**27.** As noted above, though the letter from Kane said that there had been no determination as to whether sex was the motivator behind Brogan's behavior, there is evidence, as plaintiff points out, that some administration members did think that he was found guilty of sexual discrimination. It should be noted that Brogan contends that the uncertainty among the administration members as to whether he was guilty of sexual discrimination is itself evidence that he was discriminated against because of his sex, *see* Pl.'s Supplemental Resp. at 3, though this claim is not supported.

**28.** *See also Demroff v. California Dept. of Transp.*, No. 97–55356, 1998 WL 385279, 152 F.3d 924 (9th Cir. June 22, 1998). In that case, a male plaintiff claimed that sex had been a motivating factor in his termination

A second aspect of Brogan's argument is based upon the allegedly deficient nature of Balchunis–Harris's claims.[29] While this argument may show a poor investigation, there is nowhere in Balchunis–Harris's claims the slightest evidence or inference that the behavior of the administration was prompted by the fact that Brogan is a *man.* To the extent that these claims show that the administration gave a very generous reading to Balchunis–Harris's possibly dubious claims, this shows at the most that the administration deferred to a female making claims of sexual discrimination, not that any subsequent action against Brogan was in any way motivated by the fact that he was a man.

Brogan also points to Provost Kane's deposition statement that there was a "old boy's network" as an indication that Brogan was targeted because of his sex. *See* Pl.'s Mem. at 31; Pl.'s Supplemental Resp. at 3. The context of this statement, however, bars any inference of such discrimination:

Q  [from plaintiff's counsel]: Now, with regard to Dr. Nathans [another political science faculty member], how was Dr. Nathans treated better than Dr. Balchunis–Harris?

A  [from Provost Kane]: Again, you would have to talk to Barbara [Dean Millard] about this, but he was—there was an old boy's network. They had been there forever and she was this new kid on the block who came with a very different view of the world.  They were

the power structure.  This happens.  It happens in other departments.  It's not unique to them.

*Kane Dep.* (Pl.'s Ex. 20) at 224.  Under subsequent questioning, Provost Kane stated that sex discrimination, though possibly part of the "old boy's network," was "not the bottom line."  *Id.*

Dean Millard, for her part, stated that women had experienced difficulties as La-Salle transitioned from being an all-male institution to a co-ed one, and that women who enter into areas of the university where women "had not existed before" tend to be "isolated."  *Millard Dep.* (Pl.'s Ex. 21) at 100.  While both these sets of statements might suggest that a claim of discrimination by a woman like Balchunis–Harris at LaSalle would be taken seriously, neither would lead to a reasonable inference that Brogan was targeted for investigation or terminated as Chair because of his sex.  More particularly, neither set of statements would support a reasonable inference that had Brogan been a woman, the process would have in any way taken a different course.

Brogan's argument at bottom seems to be that LaSalle's administration was spring-loaded against men accused of sex discrimination.  The record here at most supports the inference that LaSalle has done no more than what Congress itself did in 1964 when it recognized the pre-*Oncale* reality that women were not equal

from employment and argued that he had been the target of false harassment charges because of his maleness.  The Court held that judgment as a matter of law against these claims was appropriate, both because under *Oncale* a woman could equally have been accused of sexual harassment and because "[t]here is no merit to [plaintiff's] arguments that the [department of transportation's harassment and discrimination] policy unfairly weighed more heavily on males because they are more frequently accused of sexual harassment."  *Id.* at 924.

**29.**  *I.e.,* that her various claims did not in fact amount to sex discrimination and that Provost Kane and Dean Millard stated in deposi-

tions that Balchunis–Harris's claims did not amount to sex discrimination.  Brogan also mentions that Provost Kane and Dean Millard stated in depositions that (1) Balchunis–Harris sometimes focused on "non-issues," (2) she was occasionally "confused" in her claims, (3) that she may have made "exaggerated and inaccurate" complaints, and (4) that people denied a departmental recommendation for tenure often "grasped at straws", and *that despite knowing these things,* Provost Kane and Dean Millard did not question Balchunis–Harris about her claims and instead pursued the investigation.  *See* Pl.'s Mem. at 30–32; Pl.'s Supplemental Resp. at 3–4.

participants as men in the American workplace. It would be odd indeed to turn this perception of the truth back on itself to render LaSalle's approach to women's sex discrimination claims violative of Title VII.[30]

Brogan also rests his *prima facie* case on the contention that while Balchunis–Harris's claims of sexual discrimination were made the subject of an investigation, Brogan's own grievance of sexual discrimination on the part of the administration was ignored.[31] *See* Pl.'s Mem. at 32; Pl.'s Supplemental Resp. at 4. In the first place, Brogan and Balchunis–Harris were not remotely in similar situations. Balchunis–Harris was a junior faculty member undergoing tenure review, while Brogan was a senior tenured faculty member and department Chair.[32] Moreover, the nature of the complaints was different in kind: Balchunis–Harris's initial complaint, in her letter of October 15, 1996, contained specific allegations as to two particular faculty members, while Brogan's complaint was a more general procedural complaint directed at a large number of administration officials.[33] Therefore, the fact that the claims were dealt with in different ways (if indeed they were), cannot reasonably lead to an inference that the different sexes of the complainants played any part in Brogan's drama.

We therefore conclude that Brogan has failed to show that LaSalle's actions can on this record be reasonably inferred to have a sexually discriminatory purpose against him because he is a man, and he therefore has failed to make a *prima facie* case of discrimination under Title VII.

### C. *Plaintiff's Claim of Pretext*

Even if we were to find that Brogan had made out a *prima facie* case, his Title VII claim still would not survive summary judgment because he has not demonstrated that defendants' articulated legitimate, nondiscriminatory reasons for its actions are merely pretextual for invidious discrimination.

As discussed above, once a plaintiff has made out a *prima facie* case, the burden of production passes to the defendant to articulate a legitimate, nondiscriminatory reason for the action. Once this is done, it is up to the plaintiff to either discredit the proffered reason or to show that the employer's action had a discriminatory motivating cause. *See Sheridan,* 100 F.3d at 1067.

Here, in conducting the investigation of Brogan, defendants articulated as their reason that Balchunis–Harris had made allegations against him. Further, in terminating Brogan's appointment as political science department chair, defendants gave as their reason that Brogan had failed to cooperate with the ongoing investigation of Balchunis–Harris's claims, despite direction that he do so from his supervisors, Provost Kane and Dean Millard. *See* Defs.' Mem. at 20–21. These reasons are both legitimate and nondiscriminatory in that they are independent of Brogan's sex.

■ Our Court of Appeals has held that:

> [T]o defeat summary judgment when the defendant answers the plaintiff's pri-

---

**30.** It would be particularly odd to turn it back on LaSalle, given the history of that formerly all-male institution to which Dean Millard referred.

**31.** The parties dispute whether Brogan's grievance was ignored or whether he stopped the process himself. This dispute is immaterial to the Title VII claim, as discussed below.

**32.** *See also Pierce v. Commonwealth Life Ins. Co.,* 40 F.3d 796, 802–03 (6th Cir.1994) (noting that two individuals were not similarly situated for the purposes of a Title VII reverse sex discrimination claim in part because the male plaintiff was a supervisor and the alleged female "comparable" was not).

**33.** In his letter of June 6, 1997, Provost Kane asked Brogan to particularize his sexual discrimination claims made in his June 2, 1997 letter. There is no evidence that Brogan ever provided this particularized claim to the administration.

ma facie case with legitimate, non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.

*Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir.1994). Thus, a plaintiff can either discredit the articulated reason through circumstantial or direct evidence, or show that discrimination was more likely than not a motivating or determinative cause of the employment action. *See id.* This means that the plaintiff must produce evidence that would allow a factfinder reasonably to infer that the defendants' proffered explanations were either a *post hoc* fabrication[34] or did not actually motivate the employment action. *See id.* To do this, the plaintiff must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." *Id.* at 765 (internal quotation marks, citations, and emphasis omitted).

■ To support Brogan's claim that defendants' legitimate, nondiscriminatory reasons are indeed not worthy of credence, he produces evidence similar to what he cited to support his *prima facie* case above, *see* Pl.'s Mem. at 35. Brogan offers as examples of his evidence (in addition to those discussed above with respect to the *prima facie* case) that the administration failed to interview certain witnesses with respect to Balchunis–Harris's claims; the

administration refused to explain how Balchunis–Harris's claims amounted to a sex discrimination claim; the University grievance procedure was not followed in investigating Balchunis–Harris's complaint; the termination for failure to cooperate was wrong because the grievance procedure does not require cooperation;[35] the defendants insisted on Brogan's maintaining confidentiality with respect to the investigation and its outcome; and Balchunis–Harris was the first professor in thirty-eight years to be granted tenure without the recommendation of the faculty Tenure and Promotion committee. *See* Pl.'s Mem. at 32, 35–38.

This evidence does not support Brogan's pretext claim. Nothing Brogan cites suggests that his failure to cooperate was not behind his termination as Chair, and, more to the point, it certainly does not raise a reasonable inference that there was any invidious discriminatory purpose rooted in Brogan's sex. There is simply no relationship between the evidence Brogan proffers and any invidiously discriminatory motive on defendants' part. Even if Brogan's evidence were enough to raise a reasonable inference that defendants distinguished him because he had been accused of sexual discrimination, this remains insufficient to demonstrate sex-based discriminatory intent because either a man or a woman could have discriminated against Balchunis–Harris, *see Oncale*, 118 S.Ct. at 1001–02, and been subjected to exactly the same actions of which he complains.

Brogan has neither discredited the reasons LaSalle proffered for their actions toward him, nor produced any evidence to show that defendants' true motive against him was in any way based upon his sex. We therefore will grant summary judg-

---

**34.** The *"post hoc"* aspect does not apply in this case, where the defendants' articulated reasons were expressed contemporaneously with the actions Brogan objected to.

**35.** With respect to this claim in particular, as well as to the others in general, we note that "[t]o discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken." *Fuentes*, 32 F.3d at 765.

ment to defendant with respect to Brogan's Title VII claims.[36]

### III. *Claims Under 42 U.S.C. § 1983*

Brogan claims that defendants' behavior towards him constituted a violation of his rights that is actionable under 42 U.S.C. § 1983, under which statute defendants allegedly fall because, so Brogan's argument goes, LaSalle University has a symbiotic relationship with the state and federal governments. *See* Pl.'s Mem. at 39. Defendants, conversely, maintain that LaSalle University does not have a relationship with the government sufficient to subject it to § 1983's coverage. As we agree that there are no state actors here, there can be no liability under for LaSalle under 42 U.S.C. § 1983.

#### A. *Legal Standard*

■ 42 U.S.C. § 1983 states that

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable....

42 U.S.C. § 1983 (West Supp.1999). Private conduct does not fall under § 1983, but rather "state action" is required to maintain a § 1983 suit. *See, e.g., Abbott v. Latshaw,* 164 F.3d 141, 146 (3d Cir.1998). The heart of a state action inquiry "is to discern if the defendant 'exercised power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." ' " *Groman v. Township of Manalapan,* 47 F.3d 628, 639 n. 17 (3d Cir.1995) (quoting *West v. Atkins,* 487 U.S. 42, 49, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988) (in turn quot-

ing *United States v. Classic,* 313 U.S. 299, 326, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941))).

The Supreme Court has not developed a unitary approach to determine whether there has been state action, instead employing three discrete tests—the "traditional exclusive government function" test, the "symbiotic relationship" test, and the "close nexus" test—with the test to be used to be determined by the particular facts and circumstances of the case.[37] Here, in response to defendants' motion for summary judgment, Brogan alleges a "symbiotic relationship between LaSalle University and the State Federal and Local Government." *See* Pl.'s Mem. at 39. We will therefore focus on the "symbiotic relationship" test to assess whether there remains a dispute over material fact with respect to the § 1983 claim.

■ The "symbiotic relationship" test examines the relationship between the state and the alleged wrongdoer to discern whether there is a great degree of interdependence between the two. Under the test, a private party will be deemed a state actor if "[t]he State has so far insinuated itself into a position of interdependence [with the private party] that it must be recognized as a joint participant in the challenged activity, which, on that account, cannot be considered to have been so 'purely private' as to fall without the scope of the Fourteenth Amendment." *Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 725, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961).

■ Subsequent jurisprudence has held that state regulation is not enough to render the actions of an institution to be those of a state, even if the regulation is pervasive, extensive, and detailed. *See Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 350, 358–59, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). Moreover, extensive

---

**36.** To the extent that Brogan seeks to hold individual defendants liable for the alleged discrimination, we note that individual employees can not be held liable under Title VII, *see Sheridan,* 100 F.3d at 1078.

**37.** We recently had occasion to canvass the jurisprudence giving rise to these three tests in *Klavan v. Crozer–Chester Med. Ctr.,* 60 F.Supp.2d 436 (E.D.Pa.1999).

financial assistance from the state does not turn a private actor into a state actor. *See Rendell–Baker v. Kohn*, 457 U.S. 830, 842–43, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982) (rejecting a claim of state action based on the symbiotic relationship test where the institution in question received virtually all its funding from the state).[38]

### B. Application of the Symbiotic Relationship Test

■ Defendants note that LaSalle is a private institution with an independent, private board of trustees and that no fewer than one-quarter of the trustees must, by University by-laws, be Brothers of the Christian Schools, a Catholic order. It also notes that the University strives to maintain autonomous academic admissions standards and an independent governance structure. *See* Defs.' Mem. at 23–25.

Brogan in response points out that forty-two percent of LaSalle's net tuition revenue for 1996–1997 came from state and federal financial aid and that it is "possible" that LaSalle has to provide vouchers for the disbursement of the funds it receives from the Commonwealth and that it may have to make settlements with the Commonwealth's auditor general. Brogan also cites the fact that thirty-five percent

of LaSalle's development total for 1996–1997 came from government sources and that government funding has included money for various programs, including contracts with the City of Philadelphia for home visits to pregnant women, contracts for basic adult education in the community, a drug and alcohol awareness program for students, as well as a program to improve high-school math teachers' teaching skills. Brogan also mentions that LaSalle offers at least three educational programs that require state certification, and that it engages in community outreach programs. Brogan also claims that as a government contractor, LaSalle is required to maintain an affirmative action plan, and it was under this plan that he was denied his rights. *See* Pl.'s Mem. at 40–44.

This dispute need not long detain us. Brogan's argument boils down to a claim that government funding and government regulation of a college turn that institution from a private sectarian entity into a state actor. But as outlined above, it is now well-settled that neither factor, alone or together, creates a symbiotic relationship sufficient to create state action. *See Rendell–Baker*, 457 U.S. at 830, 102 S.Ct. 2764; *Jackson*, 419 U.S. at 345, 95 S.Ct. 449. Given the manifest absence of this sym-

---

**38.** In making his claim that a symbiotic relationship exists between the state and LaSalle, Brogan relies upon a nine-factor test from *Rackin v. University of Pa.*, 386 F.Supp. 992 (E.D.Pa.1974). This test predates much of the Supreme Court and Court of Appeals jurisprudence on the issue of "symbiotic relationship" state action, and many of the elements of the *Rackin* test are associated with state financial support which, as noted above, is not sufficient to create state action. As a Court in this District has noted, "[i]t is this court's view that *Rackin* does not retain vitality in light of the subsequent *Lugar* trilogy." *Imperiale v. Hahnemann Univ.*, 776 F.Supp. 189, 198 n. 4 (E.D.Pa.1991). The "trilogy" referred to is composed of *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982), *Rendell–Baker*, 457 U.S. at 830, 102 S.Ct. 2764, and *Blum v. Yaretsky*, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), all of which concern the analysis of "state action" in Constitutional

claims, and all of which were decided on June 25, 1982.

For their part, defendants rely partly on *McKeesport Hosp. v. Accreditation Council*, 24 F.3d 519 (3d Cir.1994). In this case, the court found that the Accreditation Council for Graduate Medical Education was not a state actor, and contrasted it with the University of Pittsburgh and Temple University, both of which had many incidents of state involvement, including statutory designation as "instrumentalities of the Commonwealth," trustees appointed by state officials, and tuition set by the Commonwealth. *See McKeesport Hosp.*, 24 F.3d at 525; Defs.' Mem. at 24–25. While we agree with defendants that LaSalle University does not share the state-participation elements pertaining to Temple and Pitt that were noted in *McKeesport Hospital*, the list of factors noted in that case does not form a determinative test for whether a university is a state actor.

**570**

biosis, we hold that LaSalle University is not a state actor for purposes of a 42 U.S.C. § 1983 claim. Brogan's § 1983 claim thus cannot withstand summary judgment.[39]

### IV. *Supplemental Jurisdiction*

Under 28 U.S.C. § 1367(c)(3), we may decline to exercise supplemental jurisdiction over state law claims if we have "dismissed all claims over which [we] ha[d] original jurisdiction." Before Congress adopted the supplemental jurisdiction statute, the Supreme Court had held in *United Mine Workers v. Gibbs* that "if the federal claims are dismissed before trial, ... the state claims should be dismissed as well." 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).[40]

We have found that LaSalle's behavior with respect to Brogan does not amount to sex discrimination under Title VII and that LaSalle is not a "state actor" and thus does not face liability under 42 U.S.C. § 1983. Brogan's remaining claims, sounding in defamation, breach of contract, tortious interference with contract, and infliction of emotional distress, are purely state law claims between these nondiverse parties, and are best suited for resolution in the Pennsylvania courts.

We therefore decline to exercise our jurisdiction under 28 U.S.C. § 1367(c).

---

**39.** To the extent that Brogan alleges state action on the part of the individual defendants, we find that because LaSalle University is not a state actor, its agents, including the individual defendants, cannot be state actors for the purposes of 42 U.S.C. § 1983.

**40.** Similarly, it was considered the "rule within this Circuit ... that once all claims with an independent basis of federal jurisdiction have been dismissed the case no longer belongs in federal court." *Markowitz v. Northeast Land Co.*, 906 F.2d 100, 106 (3d Cir.1990).